**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Danny Lee KYLLO, Defendant– Appellant.**

**No. 96–30333.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1997.

Opinion Decided April 7, 1998.

Petition for Rehearing with Suggestion for Rehearing En Banc Decided May 20, 1998.

Petition for Panel Rehearing Granted Jan. 12, 1999.

Opinion Withdrawn July 29, 1999.

Decided Sept. 9, 1999.

Kenneth Lerner, Lerner & Meyer, Portland, Oregon, for the defendant-appellant.

Kristine Olson, United States Attorney, and Robert R. Thomson, Assistant United States Attorney, Medford, Oregon; Demetra Lambros, U.S. Department of Justice, Washington, D.C., for the plaintiff-appellee.

David K. Allen, Portland, Oregon, for amicus American Liberties Union Foundation of Oregon, Inc.

Before: BRUNETTI,[1] NOONAN, and HAWKINS, Circuit Judges.

Opinion by Judge HAWKINS; Dissent by Judge NOONAN.

MICHAEL DALY HAWKINS, Circuit Judge:

As a matter of first impression in this circuit, Danny Lee Kyllo ("Kyllo") challenges the warrantless use of a thermal imaging device as a violation of the Fourth Amendment. Kyllo also challenges reliance on a portion of an affidavit discussing his marriage to Luanne Kyllo ("Luanne"), but omitting mention of his divorce, arguing it should not have been considered in determining whether there was probable cause to issue a warrant to search his home. We affirm, holding that the thermal image scan performed was not a search within the meaning of the Fourth Amendment, and that the district court did not clearly err in finding the omission of the Kyllos' divorce from the affidavit was not knowingly false or made in reckless disregard for the truth.

## Factual and Procedural Background

Kyllo's arrest and conviction on one count of manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1) followed an investigation by a law enforcement task force into a possible conspiracy to grow and distribute marijuana. While investigating the activities of Tova Shook, the daughter of the task force's original target, William Elliott ("Elliott"), an agent of the United States Bureau of Land Management, an agency participating in the task force, began to suspect Kyllo.

Oregon state law enforcement officers provided information to Elliott that strengthened his suspicions. He was told that Kyllo and Luanne resided in one unit of a triplex, another unit of which was occupied by Tova Shook and that a car registered jointly to Luanne and Kyllo parked at the triplex. Elliott was also informed that Luanne had been arrested the month before for delivery and possession of a controlled substance and that Kyllo had once told a police informant that he and Luanne could supply marijuana.

Elliott then subpoenaed Kyllo's utility records. Elliott compared the records to a spreadsheet for estimating average electrical use and concluded that Kyllo's electrical usage was abnormally high, indicating a possible indoor marijuana grow operation.

1. Judge Brunetti has been drawn to replace the Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, in this case.

At 3:20 in the morning in mid-January from the passenger seat of a car parked on the street, Sergeant Daniel Haas ("Haas") of the Oregon National Guard examined the triplex of homes where Kyllo resided with an Agema Thermovision 210 thermal imaging device ("the Agema 210").[2] All objects emit heat, in the form of infrared radiation, which can be observed and recorded by thermal imaging devices, such as the Agema 210. Specifically, thermal imagers detect energy radiated from the outside surface of objects, and internal heat that has been transmitted to the outside surface of an object, which may create a differential heat pattern.

In performing its function the Agema 210 passively records thermal emissions rather than sending out intrusive beams or rays—acting much like a camera.[3] A viewfinder then translates and displays the results to the human eye, with the area around an object being shaded darker or lighter, depending on the level of heat being emitted. While at first used primarily by the military, thermal scanners have entered into law enforcement and civilian commercial use.[4]

Using the Agema 210, Haas concluded that there was high heat loss emanating from the roof of Kyllo's home above the garage, and from one wall. Haas also noted that Kyllo's house "showed much warmer" than the other two houses in the triplex. Elliott interpreted these results as further evidence of marijuana production, inferring that the high levels of heat emission indicated the presence of high intensity lights used to grow marijuana indoors.

Elliott presented this information in an Affidavit to a magistrate judge, seeking a search warrant for the Kyllo home. The warrant was issued and Elliott searched Kyllo's home. As Elliott had suspected, an indoor marijuana grow operation was found, with more than one hundred plants. Marijuana, weapons, and drug paraphernalia were seized.

Kyllo was indicted for manufacturing marijuana, based upon the evidence seized during the search. The district court denied Kyllo's motion to suppress the seized evidence, following a hearing. Kyllo entered a conditional guilty plea and was sentenced to a prison term of 63 months. Kyllo then appealed the denial of the suppression motion, challenging several portions of the Affidavit as well as the warrantless thermal imager scan.

A panel of this court found that while the portion of Elliott's Affidavit discussing Kyllo's energy usage was false and misleading, the false statements were not knowingly or recklessly made. *See United States v. Kyllo*, 37 F.3d 526 (9th Cir.1994). While concluding it was therefore proper for the magistrate judge to consider that portion of the Affidavit in determining probable cause to issue the search warrant, the panel remanded for an evidentiary hearing on the intrusiveness and capabilities of the Agema 210 and a *Franks*[5] hearing on whether Elliott had knowingly or recklessly omitted Kyllo and Luanne's divorce from his Affidavit. *See id.* at 531.

Following a hearing on remand, the district court concluded that the omission of the divorce from the Affidavit, while misleading, was not knowingly false or made in reckless disregard for the truth. *See United States v. Kyllo*, No. Cr. 92–51–FR, 1996 WL 125594 (D.Or. Mar. 15, 1996).

2. Conducting a thermal emissions scan at night is a common practice, as it decreases the likelihood that "solar loading"—daytime solar energy accumulation by an object—will interfere with the effectiveness of the scan.

3. Like all objects, thermal imagers themselves emit some level of infrared radiation.

4. Besides building scans such as the scan in question in this case, thermal imagers are used by law enforcement to aid in tasks including search and rescue, locating fugitives, perimeter security, and tracking covert illegal waste discharges. Commercial uses of thermal imagers include checks for moisture in roofs, overloading power lines, and faulty building insulation.

5. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

The district court, after hearing further evidence, made factual findings on the capabilities of the Agema 210 and concluded no warrant was required before the thermal scan. The district court therefore found probable cause to issue the warrant, and denied the motion to suppress. *See id.* Kyllo now challenges this decision.[6]

### Standard of Review

■■■ "A district court must suppress evidence seized under a warrant when an affiant has knowingly or recklessly included false information in the affidavit." *See United States v. Dozier,* 844 F.2d 701, 705 (9th Cir.1988). Because it is a factual finding, we review for clear error a determination of whether false statements or omissions are intentional or reckless. *See id.; United States v. Senchenko,* 133 F.3d 1153 (9th Cir.1998).

■■■ We review de novo the validity of a warrantless search. *See United States v. Van Poyck,* 77 F.3d 285, 290 (9th Cir. 1996); *United States v. Ogbuehi,* 18 F.3d 807, 812 (9th Cir.1994). We review for clear error any underlying factual findings. *See Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Hernandez,* 27 F.3d 1403, 1406 (9th Cir.1994).

### Analysis

#### I. Search and Seizure Analysis

■■■ Kyllo's essential claim is that a warrant was constitutionally necessary before the government could employ the thermal imaging device. The Fourth Amendment's restrictions on governmental searches and seizures are triggered when the government invades an individual's privacy. *See Oliver v. United States,* 466 U.S. 170, 177–78, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The individual need not show actual intrusion or invasion into a "protected space," as "the Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizures." *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576

(1967). We follow a two-part test to determine whether the Fourth Amendment has been violated by a claimed governmental intrusion into an individual's privacy. *See id.* at 361, 88 S.Ct. 507 (Harlan, J., concurring); *see also Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (adopting *Katz* reasoning). We evaluate whether the individual has made a showing of an actual subjective expectation of privacy and then ask whether this expectation is one that society recognizes as objectively reasonable. *See Katz,* 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring); *see also California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).

■■■ In conducting this evaluation of whether a reasonable expectation of privacy has been infringed upon by government action, we consider the facts of the case at hand. *See Dow Chemical Co. v. United States,* 476 U.S. 227, 239 n. 5, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986); *United States v. Karo,* 468 U.S. 705, 712, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) ("[W]e have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment.").

No one disputes that a warrant was not obtained before the Agema 210 was used to scan the thermal emissions from Kyllo's house. In its inquiry into the technological capacities of the Agema 210, the district court found that it was a "non-intrusive device which emits no rays or beams and shows a crude visual image of the *heat* being radiated from the *outside* of the house." The court also found that "the device cannot and did not show any people or activity within the walls of the structure" and that it "recorded only the heat being emitted from the home." Based upon a review of the record, we cannot conclude that these findings were in clear error. *See Ornelas,* 517 U.S. at 699, 116 S.Ct. 1657.

6. We note that a previously filed disposition of this appeal was withdrawn.

■ Kyllo argues in opposition that the thermal scan intruded into activities within his home, in which he had an expectation of privacy, rather than measuring "waste heat" emitted from his home. We disagree with Kyllo, and follow our sister circuits in holding that the use of thermal imaging technology in this case did not constitute a search under contemporary Fourth Amendment standards. *See United ed States v. Robinson,* 62 F.3d 1325 (11th Cir.1995); *United States v. Myers,* 46 F.3d 668 (7th Cir.1995); *United States v. Ishmael,* 48 F.3d 850 (5th Cir.1995); *United States v. Pinson,* 24 F.3d 1056 (8th Cir. 1994).[7] Whatever the "Star Wars" capabilities this technology may possess in the abstract, the thermal imaging device employed here intruded into nothing.

### A. Subjective Expectation of Privacy

We reject Kyllo's argument that what occurred late that January night was government intrusion into activities in his home, in which he expected privacy, rather than a measurement of heat emissions radiating from his home. While Elliott inferred, correctly as it turned out, from the unusually high levels of thermal emissions being radiated from the roof and wall that a marijuana grow was within Kyllo's home, the Agema 210 did not literally or figuratively penetrate the walls of the Kyllo residence to expose this activity.

While Kyllo's decision to move his marijuana-growing operation indoors may well show he had some subjective expectation of privacy in the operation, he took no affirmative action to conceal the waste heat emissions created by the heat lamps needed for a successful indoor grow. The Agema 210 scan simply indicated that seemingly anomalous waste heat was radiating from the outside surface of the home,

much like a trained police dog would be used to indicate that an object was emitting the odor of illicit drugs. *See United States v. Place,* 462 U.S. 696, 706–07, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (holding canine sniffs are not searches). Kyllo made no attempt to conceal these emissions, demonstrating a lack of concern with the heat emitted and a lack of a subjective privacy expectation in the heat. *See Robinson,* 62 F.3d at 1328–29; *Myers,* 46 F.3d at 669–70; *United States v. Ford,* 34 F.3d 992, 995 (11th Cir.1994). *But see Ishmael,* 48 F.3d at 854–55 (finding subjective expectation of privacy although determining it was unreasonable). We conclude, like the district court, that the Agema 210's scan measured waste heat emissions that Kyllo had made no attempt to conceal, rather than peering into Kyllo's home, and that Kyllo has demonstrated no subjective expectation of privacy in these emissions from his home.

### B. Objectively Reasonable Expectation

■ Even if Kyllo could demonstrate a subjective expectation of privacy in the heat emissions from his residence, he has not established that this privacy expectation would be accepted by society as "objectively reasonable." "[T]he correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver,* 466 U.S. at 182–83, 104 S.Ct. 1735.

■ While a heightened privacy expectation in the home has been recognized for purposes of Fourth Amendment analysis, *see Dow Chemical,* 476 U.S. at 237 n. 4, 106 S.Ct. 1819, activities within a residence are not protected from outside, non-intru-

---

**7.** A Tenth Circuit panel opinion in *United States v. Cusumano,* 67 F.3d 1497, 1510 (10th Cir.1995) finding warrantless use of a thermal imager violated the Fourth Amendment was vacated by an en banc court, and the case decided without reaching the question. *See United States v. Cusumano,* 83 F.3d 1247 (10th Cir.1996) (en banc). We also note that

the Montana Supreme Court's holding that thermal imaging in this context was a "search" was decided under a state constitutional provision, more protective of privacy than the federal constitution. *See State v. Siegal,* 281 Mont. 250, 934 P.2d 176, 183 (1997).

sive, government observation, simply because they are within the home or its curtilage. *See Florida v. Riley*, 488 U.S. 445, 449, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (plurality opinion); *Ciraolo*, 476 U.S. at 213, 106 S.Ct. 1809. The use of technology to enhance government surveillance does not necessarily turn permissible non-intrusive observation into impermissible search. *See id.*; *Dow Chemical*, 476 U.S. at 238–39, 106 S.Ct. 1819. Much like the Fifth Circuit, we believe that, in evaluating whether technology has been used to aid in permissible observation or to perform an impermissible warrantless search, the "crucial inquiry, as in any search and seizure analysis, is whether the technology reveals 'intimate details.'" *Ishmael*, 48 F.3d at 855 (quoting *Dow Chemical*, 476 U.S. at 238, 106 S.Ct. 1819).

The thermal emission scan performed on Kyllo's residence, and the other houses in the triplex, while giving information unavailable to the naked eye, did not expose any intimate details of Kyllo's life. The scan merely indicated amorphous "hot spots" on the roof and exterior wall and not the detailed images of private activity that Kyllo suggests the technology could expose. "Such information is neither sensitive nor personal, nor does it reveal the specific activities within the ... home." *Ford*, 34 F.3d at 997; *see also Pinson*, 24 F.3d at 1059. Like the Court in *Dow Chemical*, we reject Kyllo's attempt to rely on "extravagant generalizations" about the potential invasions of privacy that this sort of advanced technology may someday present. *See Dow Chemical*, 476 U.S. at 239, 106 S.Ct. 1819.

Considering the facts of this case, and the district court's findings on the technology used, we cannot conclude that this surveillance was "so revealing of intimate details as to raise constitutional concerns." *Id.* While this technology may, in other circumstances, be or become advanced to the point that its use will step over the edge from permissible non-intrusive observation into impermissible warrantless search, we find no violation of the Fourth Amendment on these facts. *See id.* at 239

and n. 5, 106 S.Ct. 1819; *Myers*, 46 F.3d at 670 n. 1.

## II. Omission of Divorce from the Affidavit

On remand, the district court concluded that it was misleading for Elliott to omit from his Affidavit seeking the search warrant that Kyllo and Luanne had divorced. The court then concluded, however, that the omission was not knowingly false, or made in reckless disregard for the truth. Kyllo contests this conclusion.

At the hearing, no evidence was presented that Elliott, or the Oregon law enforcement officers who passed on information to him, knew of the divorce. Neither was there evidence showing that the failure to discover the divorce and include it in the affidavit was reckless.

It was not clearly erroneous for the district court to find that the omission of the divorce was not knowingly false or made in reckless disregard for the truth. *See Dozier*, 844 F.2d at 705. Thus, we agree with the district court that it was proper for the magistrate judge to consider the portion of the affidavit related to Kyllo's marriage to Luanne in determining whether probable cause existed to issue the warrant.

AFFIRMED.

NOONAN, Circuit Judge, dissenting:

The Thermovision 210, made and marketed by Agema Infrared Systems, (herein the Agema 210) is described by its maker in the following terms: "For law enforcement agencies and security organizations it provides a state-of-the-art means of extending operational capabilities and securing hard evidence not possible before. And it does it unobtrusively, noiselessly and immediately, requiring a minimum of operator training and effort." As to "Interior Surveillance," the company's sales brochure that is part of the record on appeal states: "With a field view of 8 degrees by 16 degrees, the 210, properly positioned, can monitor activity in critical

rooms or large facilities, once again providing a permanent time-tagged record when connected to a VCR."

The Agema 210 does not determine temperature but depends for its results on a comparison between the emissions from similar structures. It is not evident how these comparisons are reliable when the operator of the Agema 210 has no information about the interior insulation of either the structure he is examining or the structure he is using for comparison. The reliability of the readings of the machine is itself affected by the operator's decision to adjust it. The defendant's expert witness, who had had extensive experience working for the FBI, analyzed its vulnerability in these terms: "These infrared cameras can easily be manipulated to make a structure appear to be hot, when in reality it is not. This is achieved by increasing the gain and sensitivity buttons on the camera. The procedure is similar to using a 35 mm camera and manually opening the aperture on the lens." It is this manipulable, not very accurate or reliable but easily usable, surveillance machine which is at issue here.

The Fourth Amendment forbids an unreasonable search by the government. A search has been authoritatively defined as occurring " 'when an expectation of privacy that society is prepared to consider reasonable is infringed.' " *United States v. Karo*, 468 U.S. 705, 712, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). The term "search" is thus not itself a helpful term on which to focus. A court's attention is directed to the "expectation of privacy" and society's view of the reasonableness of the expectation.

I start with the proposition that "[t]he sanctity of the home is not to be disputed." *Segura v. United States*, 468 U.S. 796, 810, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). A search "inside a home without a warrant" is "presumptively unreasonable absent exigent circumstances." *Karo*, 468 U.S. at 715, 104 S.Ct. 3296. At the same time the

Fourth Amendment "protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). As a consequence of this axiom, a forbidden search can occur even when no trespass is involved. It is, therefore, not helpful to the government that the Agema reaches into the interior only by inference. An invasion of property is not necessary to trigger the protection of the Amendment. *See Katz*, 389 U.S. at 353, 88 S.Ct. 507.

I have no doubt that Kyllo did have an expectation of privacy as to what was going on in the interior of his house and that this expectation was infringed by the government's use of the Agema 210 although the machine itself never penetrated into the interior. The closest analogy is use of a telescope that, unknown to the homeowner, is able from a distance to see into his or her house and report what he or she is reading or writing. Such an enhancement of normal vision by technology, permitting the government to discern what is going on in the home, violates the Fourth Amendment. *See United States v. Taborda*, 635 F.2d 131, 139 (2d Cir.1980) (warrantless use of telescope to see objects not visible to the naked eye violates the Fourth Amendment). No principled difference exists between a machine capable of reading reflections of light that a telescope picks up and a machine reading the emissions of heat as does the Agema. In each case the amplification of the senses by technology defeats the homeowner's expectation of privacy. The government is not entitled to defeat this expectation by technological means. *See Karo*, 468 U.S. at 715, 104 S.Ct. 3296.

The court holds that the Agema 210 merely reads emissions off the roof. The court notes, reasonably enough, that there is no evidence that Kyllo had any expectation of privacy as to these emissions. The emissions have been treated as waste energy, comparable to the waste disposed of as garbage that the government is entitled to inspect without violating the Constitution. *See United States v. Robinson*, 62 F.3d 1325 (11th Cir.1995), *cert. denied*, 517 U.S. 1220, 116 S.Ct. 1848, 134 L.Ed.2d 949

(1996); *United States v. Myers,* 46 F.3d 668 (7th Cir.), *cert. denied,* 516 U.S. 879, 116 S.Ct. 213, 133 L.Ed.2d 144 (1995); *United States v. Pinson,* 24 F.3d 1056 (8th Cir.), *cert. denied,* 513 U.S. 1057, 115 S.Ct. 664, 130 L.Ed.2d 598 (1994).

This analogy fails because, unlike garbage which is purposely discarded, emissions of heat occur without conscious attention by the homeowner. *See United States v. Ishmael,* 48 F.3d 850, 854 (5th Cir.) (finding warrantless thermal imagery permissible but rejecting the "waste heat" analogy), *cert. denied,* 516 U.S. 818, 818, 116 S.Ct. 74, 75, 133 L.Ed.2d 34, 34 (1995). It is strange to focus on the homeowner's non-existent expectation as to emissions. The homeowner's expectation is directed to the privacy of the interior of his home. It is that expectation which the Fourth Amendment is intended to protect.

On behalf of the government, two other analogies need to be considered. If Kyllo started a fire in his fireplace there is no doubt the government could use the smoke rising from his chimney as a basis for securing a warrant if a fire in the house suggested the commission of a crime. If Kyllo was operating a methamphetamine laboratory in his home and the smell reached the nose of a policeman on the street, there would be probable cause to seek a warrant. *See United States v. Johns,* 948 F.2d 599, 603 (9th Cir.1991). The trouble with these two analogies is that they both depend on unaided human senses reading the signs from the house. In each the homeowner has no reasonable expectation that the signs will not be observed. Our case involves amplification of the senses by technology. That kind of amplification is critical as it defeats the homeowner's expectation. It is the effect on this expectation that makes the amplification impermissible.

Given that Kyllo does have an expectation of privacy as to the interior of his home, is society prepared to view it as reasonable? Here is the point at which the protection of the Fourth Amendment is in tension with the social desirability of suppressing crime wherever it is found. The Fourth Amendment is not intended to make the home a sanctuary for the commission of crime with impunity. It is intended to allow governmental intrusion into the home only in exigent circumstances or upon judicial approval of the intrusion. A different rule might be fashioned, but the present rule is that even a search to find probable cause for obtaining a warrant—even such a search which has as its object the ultimate obtaining of a magistrate's approval—cannot be conducted without violation of the Fourth Amendment. *See Karo,* 468 U.S. at 710, 104 S.Ct. 3296. Society has determined that it is reasonable for the home to be a citadel safe from warrantless inspection. *See Segura,* 468 U.S. at 810, 104 S.Ct. 3380.

It is argued that the several decisions by circuit courts already cited show society's disapproval of the expectation of privacy as to emission of heat. There are, however, cases in the contrary direction. Two state cases within this circuit, *State v. Siegal,* 281 Mont. 250, 934 P.2d 176 (1997), and *State v. Young,* 123 Wash.2d 173, 867 P.2d 593 (1994), have found thermal imaging to violate state constitutions. Two courts have held it violative of the Fourth Amendment. *See People v. Deutsch,* 44 Cal.App.4th 1224, 52 Cal.Rptr.2d 366 (1996); *United States v. Field,* 855 F.Supp. 1518 (W.D.Wis.1994). In the end what society is prepared to find reasonable must, for us, be determined by the most relevant analyses and analogies. To conclude that because this court holds the expectation unreasonable it is unreasonable is to argue in a circle.

The only Court of Appeals to consider this question and determine that the use of thermal imaging is unconstitutional was the Tenth Circuit in *United States v. Cusumano,* 67 F.3d 1497 (10th Cir.1995). The opinion was vacated on rehearing en banc on the ground that the court did not need to reach the thermal imaging question. *See United States v. Cusumano,* 83 F.3d 1247 (10th Cir.1996). Consequently, the decision does not have more than a hypothetical character, but it has been

praised as "the most exhaustive and compelling analysis of the use of a thermal imager." Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 2.2 (Supp.1998). Professor LaFave himself argues forcefully in support of the analysis and conclusion. *See id.* The expectation analyzed by *Cusumano* and LaFave is not the expectation of the homeowner as to the emissions from the roof, but the homeowner's expectation as to the privacy of the interior of the home. That the interior is the proper focus is argued by analogy with *Katz*—in *Katz* the focus having been on the phone conversation, not on "the molecular vibrations of the glass that encompassed [the] interior," which were the vibrations actually picked up by the bug. *Cusumano*, 67 F.3d at 1501. Technological enhancement that reveals conversation is impermissible. *See Katz*, 389 U.S. at 353, 88 S.Ct. 507.

The first reaction when one hears of the Agema 210 is to think of George Orwell's *1984*. Although the dread date has passed, no one wants to live in a world of Orwellian surveillance. On the hearing of this case on its first appeal we were prompt to express concern as to whether the Agema 210 could "detect sexual activity in the bedroom," and to state that a technology revealing sexual activity was impermissible. *United States v. Kyllo*, 37 F.3d 526, 530 (9th Cir.1994). On this appeal the majority does not deviate from this position while it views the Orwellian dangers as speculative and at most potential.

The Agema 210 is a crude instrument. It reveals only two things: Heat-causing activity within a home and the rooms or area where the heat is being generated. For the majority these limited capacities let the Agema 210 pass muster: The "crucial inquiry" for the majority is whether the Agema 210 reveals "intimate details." Because what it reveals is not sensitive or personal or a specific activity, no unconstitutional search is being performed. It is as though if your home was searched by a blind policeman you would have suffered no constitutional deprivation.

The majority's error has been to focus on a phrase from dicta on *Dow Chemical Co. v. United States*, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). At issue in *Dow Chemical* was aerial photography of a 2,000 acre manufacturing plant. The Court held: "We conclude that the open areas of an industrial plant complex with numerous plant structures spread over an area of 2,000 acres are not analogous to the 'curtilage' of a dwelling for purposes of aerial surveillance." *Id.* at 239, 106 S.Ct. 1819. In reaching this conclusion, the Court observed: "It may well be, as the Government concedes, that surveillance of private property by using highly sophisticated surveillance equipment not generally available to the public, such as satellite technology, might be constitutionally proscribed absent a warrant. But the photographs here are not so revealing of intimate details as to raise constitutional concerns." *Id.* at 238, 106 S.Ct. 1819. To rely on the phrase "intimate details" as stating the criterion is to wrench the phrase from context. *Dow Chemical* was not about a home, an enclosed space or anything going on in a home. If *Dow Chemical* is to be invoked at all, the dicta on intimate details is controlled by the dicta warning on the use of "highly sophisticated surveillance equipment not generally available to the public." *Id.* Because of its error as to the crucial inquiry, the majority sees the dangers presented by the Agema 210 as merely potential, not actual. To the contrary, the intrusion into the home, while gross and global, is also real. A variety of heat-producing activities can take place within the walls of a home. As to such of these activities as are innocent, no one doubts that society views the expectation of privacy as reasonable— for example, the use of a sauna in a sauna room; the making of ceramics in a kiln in the basement; the hothouse cultivation of orchids, poinsettias or other plants in a domestic greenhouse. Any of such activities can cause the emission of heat from the home which the Agema 210 can detect. The activity will be reported as well as

where it is taking place. That is the present, not potential, intrusion of privacy which the Agema 210 can effect.

The defense of the machine that it does not see very well hurts the government by underscoring the unreliability of the Agema 210. This defense amounts to saying that if a constable makes a blundering search, it should not really count as a search. The argument is the opposite of that which justified the examinations in *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and *Jacobsen*, 466 U.S. at 123, 104 S.Ct. 1652,—they revealed only contraband and nothing else. The machine as blind or blundering constable does not pass the criteria of the Fourth Amendment.

The government does not contend that the information provided the magistrate was sufficient to sustain a search warrant without the addition of the Agema readings. As these readings violated the Constitution, they should be suppressed and the conviction reversed.