**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Quentin HINTON, aka Ronnie**
**Baldwin, Defendant–**
**Appellant.**

No. 99–10344.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 10, 2000

Filed July 25, 2000

666

Geoffrey A. Hansen, Chief Assistant Federal Public Defender, Steven G. Kalar, Assistant Federal Public Defender, San Francisco, California, for the defendant-appellant.

Miranda Kane, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.

Before: TASHIMA and GRABER, Circuit Judges, and KELLEHER,[1] Senior District Judge.

KELLEHER, District Judge:

Appellant Quentin Hinton, aka Ronnie Baldwin ("Hinton"), appeals his conviction prosecuted from a three-count indictment. The jury returned a guilty verdict for the following three counts: (1) causing the delivery by mail of a revolver (18 U.S.C. § 1715 (1999)); (2) causing the delivery by mail of ammunition (18 U.S.C. § 1716(i)(2)); and (3) shipping and transporting a firearm in interstate commerce (18 U.S.C. § 922(g)(1)). Hinton challenges the sufficiency of the evidence for all three counts, as well as the district court's denial of his motion to suppress evidence obtained from a package that was retrieved without a search warrant. He does not appeal his sentence. We affirm the district court's holdings as to all three counts.

## FACTS AND PROCEDURAL BACKGROUND

### A. Underlying Offense

A number of years ago, Hinton was found guilty of crimes in both federal and state courts. After completing his prison terms, Hinton was required to report to a federal probation officer. He did not, and an arrest warrant was issued for his probation violation. Deputy marshals began a search for him and, five years later, the Marshal's Service had reason to believe that Hinton was in the San Francisco area. Based upon information received from the Social Security Administration, three deputy marshals began surveillance of a certain post office box in a San Francisco postal annex.

On August 6, 1998, two deputies went to the postal annex on a routine check of the post office box. They were given access by postal employees to the mail sorting area, which is closed to the public. At this postal annex, the post office boxes are closed and locked to the outside, but are open and in plain view to the postal workers in the mail sorting area. From the sorting side, the deputies could see that Hinton's box contained a key for one of the parcel lockers. A key to a parcel locker allowed patrons to have access to oversize packages without having to wait in line for a postal clerk.

One of the marshals took the locker key from Hinton's box, and was escorted by a postal employee to the parcel lockers. Like the mailboxes, the parcel lockers have solid doors facing the lobby. However, unlike the mailboxes, the interior sides of the parcel lockers are not open to the mail sorting area. Rather, the backsides of the oversized lockers have solid doors that can be opened without a key from the postal employees' side. Hinton's package was removed from the employees' side

---

1. The Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation.

without using the key from Hinton's mailbox. The marshals copied the information on the outside of the package, which showed that the package was addressed to "Mr. Hinton" with a return address of "Ron Baldwin" in Alva, Oklahoma.

The manager of the postal annex gave permission to one of the marshals to remove the locker key from Hinton's mailbox and replace it with a yellow slip. The yellow slip required Hinton to wait in line to receive his package and limited the time during which Hinton could retrieve his package to regular business hours. The manager stored Hinton's package in her office.

With the manager's permission, for a week, deputy marshals surveilled Hinton's mailbox from within the employee area. In order to facilitate their surveillance efforts, one of them pulled a piece of mail partially out of Hinton's box so that they would notice if there was movement in the box.

## B. Hinton's Arrest

On August 13, 1998, Hinton picked up his mail but did not redeem the yellow slip for his package. The deputy marshal on surveillance and a local police officer arrested Hinton as he left the postal annex. At the time of his arrest, Hinton carried a Nevada driver's license bearing his own picture, but the name "Ronnie Baldwin," and a Greyhound bus ticket receipt showing travel between Oklahoma and San Francisco. On that same day, he was processed and transported to the North Alameda County Jail. The deputies had procured no search warrant to this point.

After Hinton was arrested, a deputy notified the manager of the postal annex of the arrest and told her to keep Hinton's package in case the postal inspectors were interested in it. Within a day, a postal inspector picked up the package.

## C. The Search of the Package

On August 17, 1998, the postal inspector applied to a federal magistrate judge for a warrant to search the package seized from Hinton's locker. In the search warrant affidavit, the postal inspector reported that the package's weight and the shifting of its contents appeared suspicious. Because it was a fourth-class package, it was subject to inspection by authorized postal employees. The postal inspector reported that a colleague had x-rayed the package and saw what he believed to be a revolver. The postal investigator also discussed Hinton's probation violation and the surveillance and arrest of Hinton. He did not include any information regarding the removal of the key from the mailbox and of the package from the parcel box.

On that same day, a magistrate judge authorized a search warrant for the package, based on this affidavit. A search of the package produced the revolver and twelve rounds of ammunition which form the basis for the charges against the defendant.

## D. The Search of the Oklahoma House

Multiple sources, including the postmaster for the only post office in the area, confirmed that "Ronnie Baldwin" was the occupant of the Alva, Oklahoma, address listed as the return address on the package. Accordingly, a search warrant was issued allowing the postal inspector to seize documents and records that would establish the identity of the owner/occupant of the Alva, Oklahoma, house. When the search warrant was executed at the house, law enforcement officers discovered numerous items in the name of Ronnie Baldwin, as well as a pistol, two rifles, a bayonet, and ammunition hidden under the house.

## E. Motion to Suppress

On September 23, 1998, Hinton filed a motion to suppress the package and its contents, arguing that the package was unlawfully seized when the yellow slip was

substituted for the parcel locker key in Hinton's mailbox. The district court denied the motion, ruling that, even if the postal authorities were alerted to the package by the marshals, "ultimately the decision to search [the package] was made independently by the postal authorities and not at the insistence or instruction of the United States Marshals."

### F. The Trial

Hinton concedes that, at trial, "[t]aken in the light most favorable to the government, the evidence tended to show that Mr. Hinton mailed a gun from Hardtner, Kansas. The addresses on the package listed 'Ron Baldwin,' an alias of Mr. Hinton, as the sender, and Mr. Hinton as the intended recipient." Nevertheless, Hinton challenges the sufficiency of the evidence for all three of the following counts: (1) causing the delivery by mail of a revolver (18 U.S.C. § 1715); (2) causing the delivery by mail of ammunition (18 U.S.C. § 1716(i)(2)); and (3) shipping and transporting a firearm in interstate commerce (18 U.S.C. § 922(g)(1)). He also challenges the district court's denial of his motion to suppress.

### DISCUSSION

**A. The government presented sufficient evidence for a reasonable jury to find that Hinton caused to be delivered a revolver and ammunition in San Francisco on or about August 14, 1998.**

 This court reviews de novo the district court's ruling on a Federal Rule of Criminal Procedure 29 motion. *See United States v. Yankowski,* 184 F.3d 1071, 1072 (9th Cir.1999). There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offenses charged beyond a reasonable doubt. *See United States v. Nelson,* 137 F.3d 1094, 1103 (9th Cir.1998).

Hinton was convicted of one count of violating 18 U.S.C. § 1715 and one count of violating 18 U.S.C. § 1716. Section 1715 provides, in pertinent part:

> Whoever knowingly deposits for mailing or delivery, or knowingly causes to be delivered by mail according to the direction thereon, or at any place to which it is directed to be delivered by the person to whom it is addressed, any pistol, revolver, or firearm declared nonmailable by this section, shall be fined under the title or imprisoned not more than two years, or both.

Section 1716 uses the same wording to criminalize the mailing of "injurious articles," although it generally provides for a lesser penalty unless there was an intent to kill.

 Hinton argues that the district court wrongly denied his motion for acquittal pursuant to Federal Rule of Criminal Procedure 29 because the government failed to prove that the firearm and ammunition were "delivered" for purposes of 18 U.S.C. §§ 1715 and 1716. Hinton's argument rests upon the definition of "delivered." As far as we can determine, no court has ever defined "deliver" for the purposes of §§ 1715 and 1716. The statute itself does not define "delivered," and the wording of the statute does not give a clear indication of the meaning.

Hinton argues that we should adopt the definition of "delivered" that has been developed for 18 U.S.C. § 1702, which prohibits obstruction of mail delivery. Under this line of cases, defendants who have removed mail from apartment mailboxes or tables in common areas have argued unsuccessfully that delivery was complete when it arrived at the location, so that they could not be convicted under the statute. *See, e.g., United States v. Brown,* 425 F.2d 1172, 1174 (9th Cir.1970). In upholding the conviction in *Brown,* the Ninth Circuit held that " § 1702 protects the mail until it is *actually received by the addressee.*" *Id.* (emphasis added).

Hinton urges that the same definition of "deliver" should apply when used in §§ 1715 and 1716. He claims that, because the marshals seized the package before Hinton himself actually received it, he did not knowingly cause the package to be delivered "according to the direction thereon, or at any place to which it is directed to be delivered by the person to whom it is addressed," as required by the statute. *See* 18 U.S.C. §§ 1715, 1716(h). Under Hinton's reading, delivery "according to the directions thereon" requires receipt by the addressee. Consequently, because Hinton himself never actually received the package, he cannot be guilty of violating either §§ 1715 or 1716.

Hinton's reliance on § 1702 is unavailing. Both the purposes and the wording of the statutes are distinctly different, and they do not support the grafting of § 1702's definition of "delivered" onto §§ 1715 and 1716.

Congress, in enacting 18 U.S.C. § 1702 and its predecessor statutes, intended to "insure that correspondence between a sender and an addressee be unobstructed until ... delivered to the addressee and that any person ... who in any manner interfered with or prevented such delivery, violated the statute which was designed to protect the mail from every kind of danger, theft, or taking." *United States v. Wade*, 364 F.2d 931, 934 (6th Cir.1966). Consequently, this section defines "delivery" according to the purpose of the statute. Section 1702 specifically prohibits the removal of mail "before it has been delivered *to the person* to whom it was directed." (Emphasis added). As Congress recognized in its definition, it is logically impossible to find a defendant guilty of "obstruction of correspondence" when the package reached the intended addressee before any interference could occur.

By contrast, §§ 1715 and 1716 punish the act of mailing guns and injurious articles. Whether the articles arrive at the intended person or even the intended destination matters less than that they were mailed at all. Sections 1715 and 1716 merely punish those who cause packages of guns or injurious articles to be delivered "according to the direction thereon." In the context of §§ 1715 and 1716, "deliver" is used in its common form, without the further narrowing necessary under § 1702. We will not impute a narrowed definition where Congress has not provided for one. "Deliver" simply means to "give; transfer; yield possession or control of; make or hand over; [or] ... to send to an intended destination...." Webster's Third International Dictionary Unabridged 597 (1966) (hereinafter "Webster's Third").

The government proved that the package containing the guns and ammunition were sent by Hinton and arrived at the mailbox address according to the direction on the package. Thus, the government presented sufficient evidence for a reasonable jury to find that Hinton caused a firearm and ammunition to be delivered by mail, as required by 18 U.S.C. §§ 1715 and 1716.

**B. The government presented sufficient evidence for a reasonable jury to find that Hinton shipped and transported in interstate commerce a firearm in San Francisco on or about August 14, 1998.**

██ Count Three involves the following charges under 18 U.S.C. § 922(g)(1) and (2), which forbids the unlawful shipment and transportation of a firearm by a felon and fugitive:

The Grand Jury Further charges that:

On or about August 14, 1998, in the City and County of San Francisco, State and Northern District of California, QUENTIN HINTON, aka RONNIE BALDWIN, defendant herein, having previously been convicted of a felony punishable by imprisonment for a term exceeding one year, and being a fugitive from justice, knowingly did ship and transport in interstate commerce a firearm, to wit, a Ruger Redhawk .44 mag-

num revolver, serial number 502–90981, and twelve (12) rounds of .44 magnum ammunition, all in violation of Title 18, United States Code, Section 922(g)(1) and (2).

The jury found Hinton guilty of the above offense. However, the facts proved at trial showed that (1) on August 14, 1998, Hinton was in the custody of the United States Marshals and was unable to mail anything in San Francisco; and (2) Hinton had mailed the package at issue at a post office in *Hardtner, Kansas,* on *July 27, 1998.* Further, unlike in Counts One and Two, in Count Three, the government did not employ any of the usual catch-all phrases. In Counts One and Two, the government charged that Hinton "*cause[d* the package] to be delivered" in San Francisco "*and elsewhere."* No such language was included under Count Three.

Hinton attacks Count Three in two ways. He claims that, because he was already in custody on August 14, and the package was sent from Kansas, there are not sufficient facts to support a conviction on Count Three. Further, he argues that, even if the erroneous location and date are insufficient to acquit, Hinton cannot be guilty of "shipping" as used in the statute.

### 1. The plain meaning of "ship" applies to violations of 18 U.S.C. § 922(g)(1) and (2).

#### a. *United States v. Mohrbacher* is not instructive.

█ Hinton argues that he did not "ship" the package; he *caused* the gun to be shipped by placing the gun and ammunition into the control of the post office. Because he was not charged with "causing" the package to be shipped, Hinton argues, he cannot be found guilty of Count Three.

Hinton discusses at length *United States v. Mohrbacher,* 182 F.3d 1041 (9th Cir. 1999), a case in which we conducted an exhaustive dissection of another statute that punishes for shipping and transport-

ing certain items. In *Mohrbacher,* the defendant had been found guilty of transporting, receipt and possession of child pornography. *See id.* at 1044–46. We reversed the conviction for transporting and shipping the pornography, because we determined that there was no proper distinction between § 2252(a)(1)'s *shipping* provision and § 2252(a)(2)'s *receiving* provision. *See id.* at 1050. The defendant had ordered and subsequently downloaded pictures from a pre-existing network on the Internet. We determined that the act was "more analogous to ordering materials over the phone and receiving materials through the mail than to sending or shipping such materials." *Id.*

*Mohrbacher* is readily distinguishable. First, the processes involved in downloading from the Internet are very different from the act of shipping a package in the United States mail. In the Internet context, a party initiating contact will stay within the confines of his home, office, or other personal space and request that a pre-existing network send an item of *information* to him. But in the postal system, a party affirmatively acquires the package himself, and then physically enters the package into the mail system so that the *object* goes *away* from the person initiating the conduct, rather than toward him. These are completely different processes.

Further, downloading by definition is the act of "*receiv[ing]* information, typically a file, from another computer to yours via your modem. . . . The opposite term is upload which means to send a file to another computer." *Id.* at 1048 (citing to Alan Freedman, *Computer Words You Gotta Know! Essential Definitions for Survival in a High–Tech World* 49 (1993)) (emphasis added). Consequently, a crime involving downloading more readily conforms to a charge of receipt than to one for transporting or shipping.

Finally, in the statute at issue in *Mohrbacher,* "Congress chose to separate the provision that makes transporting or shipping unlawful from the subsection that

672

criminalizes receiving or distributing." *Id.* Under 18 U.S.C. § 2252, a defendant could be charged with one count of transporting and another count of receiving and another count of possessing all for the same underlying offense. But Congress did not differentiate between the actions under § 922(g) as it did under § 2252. Hinton would be guilty of only one count under 18 U.S.C. § 922(g) whether he ships, possesses, *or* receives any firearm or ammunition. It does not matter which of these words is used to signify the violation of the statutory section; the violation still exists. Because of these substantial differences between the statutes at issue in the two cases, the opinion in *Mohrbacher* does not control.

### b. Hinton shipped the package containing guns and ammunition.

Instead, the plain text of the statute dictates whether Hinton could be convicted of shipping the package. Subsections 922(g)(1) and (2) provide that it is unlawful for a convicted felon or a fugitive to "ship or transport any firearm or ammunition in interstate or foreign commerce." 18 U.S.C. § 922(g)(1) & (2). Webster's Third defines the verb "ship" as "to cause to be transported." Webster's Third, *supra,* at 2096. Transport means to "transfer or convey from one person or place to another: to CARRY, MOVE." *Id.* at 2430. By bringing his package to the post office and beginning the mailing process, Hinton definitely caused the package to be transported by the United States postal system. Consequently, Hinton shipped the package as that term is used in § 922(g)(1) & (2).

### 2. The indictment was legally sufficient to apprise the Defendant of the charges against which he must defend.

Hinton also argues that there were not sufficient facts proved at trial that supported his conviction of Count Three as the indictment described it. Although we agree that Count Three of the indictment could have been more artful, we conclude that there were sufficient facts to support the conviction.

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment be a "plain, concise and definite written statement of the essential facts constituting the offense charged." An indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. Givens,* 767 F.2d 574, 584 (9th Cir.1985) (citations omitted). In essence, a legally sufficient indictment must state the elements of the offense charged with sufficient clarity to apprise a defendant of the charge against which he must defend and to enable him to plead double jeopardy. *See id.* Further, the test of sufficiency of the indictment is not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards. *See United States v. Rosi,* 27 F.3d 409, 415 (9th Cir.1994).

### a. The difference between the dates is not significant.

The discrepancy between the date as charged and the date actually mailed is not significant. It is well-settled that the government need prove only that Hinton shipped the package "reasonably near" the date specified in the indictment. *See United States v. Tsinhnahijinnie,* 112 F.3d 988, 991 (9th Cir.1997) ("The government ordinarily need prove only that the crime occurred on a date reasonably near the one alleged in the indictment, not on the exact date.").

The "reasonably near" standard provides the government a significant amount of leeway in drafting its indictments. For example, a nineteen-day variance was held immaterial in *Lelles v. United States,* 241 F.2d 21, 25 (9th Cir. 1957), and evidence specifying only "July 1995" was considered "reasonably near"

the indictment's July 10, 1995 charge in *United States v. Alviso,* 152 F.3d 1195, 1197 (9th Cir.1998). By contrast, cases in which we have found variances in dates to be prejudicial have involved large differences between the facts proved and the dates alleged in the indictment. *See, e.g., Tsinhnahijinnie,* 112 F.3d at 991–92 (disallowing a *two year* variance); *United States v. Casterline,* 103 F.3d 76, 78–79 (9th Cir.1996) (excluding conduct that occurred seven months before the date charged in the indictment).

In this case, the indictment stated that Hinton was charged with shipping the package "on or about August 14." The difference between the date stated on the indictment and the date on which Hinton initiated the shipping process is only eighteen days. In addition, the wording of the indictment gives notice that the date stated in the indictment may not be the precise date on which the event actually occurred. Because the difference in date is not very significant and because the indictment provides notice that the date is not precisely known, the date on the indictment is "reasonably near" to the date the shipping process began. Further, as discussed below, given the continuing nature of the offense, and the difference in the date on the indictment and the date(s) of shipping, there is even less of a variance than the parties argue.

### b. The difference between the locations is not significant.

■ The difference in the location as charged and the location in which the shipping was initiated also is not significant. At first glance it appears that although he was charged as shipping in San Francisco, his affirmative actions within the shipping process actually occurred halfway across the country in Kansas. However, the pur-

pose of including the location of the shipment in the information is to apprise the defendant of the charge against which he must defend. *See Givens,* 767 F.2d at 584. That goal was accomplished in this case. Although normally an indictment that charges an action in San Francisco, California, will not clearly apprise a defendant that he is being charged with actions originating in Hardtner, Kansas, in this case, it did.[2]

Shipping is a continuous offense. By definition, it entails transferring from "one ... place *to another."* Webster's Third, *supra,* at 2430 (emphasis added). Hinton caused the package to be transported from Hardtner, Kansas, *to San Francisco, California.* Whether the information specified the point of origin or the point of destination does not matter. Hinton knew that the action he began in Hardtner, Kansas would become final in San Francisco, California, because he addressed the package to San Francisco. When Hinton read the indictment, there could have been no confusion as to what charges he would need to defend against. In this case and under the text of this statute, the facts as presented to the jury were legally sufficient to uphold a conviction of Count Three of the indictment.

**C. The district court did not err in denying defendant's motion to suppress evidence obtained from a package that was removed from a post office parcel locker and examined without a search warrant.**

■ We review de novo the validity of a warrantless search and review for clear error any underlying factual findings. *See United States v. Kyllo,* 190 F.3d 1041, 1045 (9th Cir.1999).

Hinton challenges the district court's denial of his motion to suppress. He claims

**2.** It is certainly true that the information could have included an explanation that would indicate that the location was not precisely known. For example, the indictment could have stated that Hinton shipped the

package from "San Francisco, California *or elsewhere,"* rather than only that he shipped from "from San Francisco, California." However, in this case, such equivocation was unnecessary.

that the warrantless search and seizure of a package delivered to a locked and enclosed postal locker violated his legitimate expectation of privacy. Hinton believes that he has a legitimate expectation of privacy in a postal package delivered to the post office since the mailbox was locked to the public, and the parcel locker was not exposed to the employee area.

In support of his contention that his privacy interest in the package was violated, Hinton makes the following three arguments. First, he contends that extensive postal regulations were developed to protect privacy interests in mail, and were violated by the marshals in this case. Second, he argues that a postal customer has a legitimate privacy interest in the address information on mail that is already enclosed and locked in a mailbox, so that copying the information on the package was a violation of that privacy interest. And third, he claims that the replacement of the locker key by a yellow slip limits the hours for package recovery, resulting in an infringement on privacy.

### 1. A violation of a postal regulation does not warrant suppression of the evidence.

Title 39, Section 233.3 of the Code of Federal Regulations, regulates the use of "mail covers." 39 C.F.R. § 233.3 (1999). A "mail cover" is a term of art within the postal system "by which a nonconsensual record is made of any data appearing on the outside cover of any sealed or unsealed class of mail matter ... to obtain information in order to ... [l]ocate a fugitive." The regulation applies to all classes of mail, including fourth-class mail, which was used in this case. *See id.* at § 233.3(c)(2). Mail covers may be ordered only pursuant to a written request to the Chief Postal Inspector or his authorized agents specifying the reasonable grounds necessary for the cover. *See id.* at § 233.3(d) and (e). Exceptions apply to undelivered mail, damaged mail, and mail that poses an immediate threat to persons or property. *See id.* at § 233.3(f)(1) and (2). The regulations further state that "[u]nder no circumstances may a postmaster or postal employee furnish information as defined in § 233.3(c)(1) to any person, except as authorized by mail cover order." *Id.* at § 233.3(g)(4). Hinton claims that, because the marshals did not follow the proper procedures for initiating a mail cover, the evidence taken from the search should be suppressed.

Although it is undisputed that the officers did not follow the proper procedures for obtaining a mail cover, suppression is not the appropriate remedy for a failure to follow agency regulations. *See United States v. Ani,* 138 F.3d 390, 392 (9th Cir.1998). In *Ani,* we held that the exclusionary rule was not triggered when a customs inspector searched a package sent via international mail without reasonable cause and contrary to postal regulations. Rather, we held that, because border searches of international mail do not require probable cause, the customs inspector's search did not violate a *constitutional* mandate. *See id.* In fact, we specifically held that, "[a]bsent a constitutional violation or a congressionally created remedy, violation of an agency regulation does not require suppression of the evidence." *Id.* (citations omitted).

We are aware that, in *Ani,* although the search was assumed to violate the postal regulation, the search was conducted by a person authorized to conduct border searches-a customs inspector. In this case, while a postal employee would be authorized to determine the mailability of a package, a United States marshal probably would not.

Nevertheless, a violation of a regulation does not mandate suppression of the evidence. In *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), the Supreme Court held that the exclusionary rule did not apply to tape recordings by IRS agents which were obtained in violation of agency regulations. The Court feared that rigid application of

the exclusionary rule would have a serious deterrent effect on the formulation of additional standards and regulations by agencies. *See id.* at 756, 99 S.Ct. 1465. Because the defendant's constitutional and statutory rights were not violated, exclusion of the evidence was improper. *See id.* at 744, 99 S.Ct. 1465.

Hence, the relevant query is whether a constitutional right, not an agency regulation, has been violated. Consequently, rather than automatically suppress the evidence due to a violation of agency regulations, we must determine whether Hinton has a constitutional right of privacy to the information on the outside of a fourth-class package found in a partially secure parcel locker.

### a. There is no expectation of privacy in the outside of a package.

 There is no expectation of privacy in the addresses on a package, regardless of its class. The Supreme Court has held that the inspection of the outside of first-class mail did not disturb any privacy interest. *See United States v. Van Leeuwen,* 397 U.S. 249, 250–52, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970), *cited in United States v. Choate,* 576 F.2d 165, 177 (9th Cir.1978) (en banc) (reasoning reinforced in *United States v. Choate,* 619 F.2d 21, 22 (9th Cir.1980)). This court specifically held in *Choate,* 576 F.2d at 167, that the mail cover regulations do not violate the Fourth Amendment. We stated that "[s]enders knowingly exposed the outsides of the mail to postal employees and·others, and defendant could not keep those areas private." *Id.* at 177. Because Hinton exposed the outside of his package to postal employees and others, Hinton did not have a reasonable expectation of privacy in the address affixed thereon.

### b. There is no expectation of privacy in a parcel locker.

 There also is no reasonable expectation of privacy in a parcel locker. Under *United States v. Kyllo,* 190 F.3d

1041, 1045 (9th Cir.1999), in order to find governmental intrusion into Hinton's privacy, we must find *both* that society has a reasonable expectation of privacy in a parcel locker *and* that Hinton himself had a subjective expectation of privacy. *See id.* (citing *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Hinton claims that, because the parcel locker was enclosed on all sides and locked to the public, he had a reasonable expectation of privacy in that locker. The government, in contrast, argues that, because the parcel locker was accessible to postal employees, the locker was not protected. Both parties cite *United States v. Osunegbu,* 822 F.2d 472 (5th Cir.1987), in support of their respective positions.

In *Osunegbu,* the Fifth Circuit upheld a warrantless search of a private post office box during which postal inspectors examined the exterior of the mail inside the box. In its analysis, the Fifth Circuit gave a lengthy explanation of the postal annex room's layout and the procedure employed by the annex's manager of mail delivery. The court noted that the manager would often have to look at the addresses on envelopes to confirm that they were properly distributed, and would move packages from one mailbox to another if a box became over-filled. Consequently, because of the minimal expectation of privacy as to the contents placed in the mailbox, and the manager's unfettered access to the mail in the locked mailboxes, the Fifth Circuit concluded that the mailbox manager could consent to the search of the mailbox. *See id.* at 480.

Hinton argues, however, that in his case the parcel locker was analogous to the "locked locker, a hotel room, or an apartment" that the *Osunegbu* court mentioned in dictum, rather than to the private mailbox actually at issue in the case. Before commenting on the validity of the search of the mailbox rented in *Osunegbu,* the court distinguished the *Osunegbu* situation from other situations in which the defen-

dants *did* have reasonable expectations of privacy. The Fifth Circuit noted

> [C]ourts have recognized both that renters of [locked lockers, hotel rooms, or apartments] have a reasonable expectation of privacy protected under the Fourth Amendment and that this expectation of privacy is not destroyed by the fact that the lessor or landlord possesses a key and has maintained a limited right to enter the rental premises for repair, inspection, and similar purposes.

*Id.* at 478 (footnote omitted). Because the parcel locker was enclosed on all sides, including the side facing the employee area, and the package had already arrived at its location awaiting pick-up, Hinton argues that his package was in the equivalent of a locked locker and deserves protection.

Hinton's argument is unpersuasive. A further comparison between the facts in *Osunegbu* and those at bar reveals that there is not a substantial difference between the two cases. As in *Osunegbu*, the San Francisco postal employees presumably may relocate any packages placed within the parcel lockers at any time. The parcel lockers are not individually rented, but are provided as a service and a substitute for waiting in the regular postal line. The postal employees would have the right to move the packages whether the parcel locker has a back door facing the employee area or not, because the right to move the packages exists irrespective of a locker's enclosure. In sum, one may not claim an objectively reasonable expectation of privacy in a parcel locker that cannot be individually rented, and from which the contents can be moved at employees' discretion.

Because there is no reasonable expectation of privacy in a parcel locker at a post office, we need not determine if Hinton had a subjective expectation of privacy therein.

## 2. There are no privacy implications in the substitution of a yellow slip for a locker key.

Hinton claims that his privacy was infringed when the locker key was replaced by the delivery slip, because it limited Hinton's access to his package. Hinton relies on *United States v. Dass*, 849 F.2d 414 (9th Cir.1988), in support of his contention. In *Dass*, we made clear that federal agents may not unduly detain or seize mail while waiting to seek a search warrant. *See id.* at 415. Hinton claims that, by switching the delivery slip for the locker key, there was an impermissible detention of Hinton's package under *Dass*.

*Dass* is distinguishable. In *Dass*, the packages were actually detained from seven to twenty-three days prior to obtaining search warrants. In this case, because Hinton went to the post office during regular business hours, the detention was theoretical at most; and even in theory, the detention was minimal because of the post office's hours. At the time he picked up his mail, including his yellow slip, Hinton could have gone to the postal clerk to pick up his package immediately. Consequently, no actual detention by the marshals occurred. Moreover, even if the substitution of the yellow slip for the parcel locker key could be considered a "detention," a package may be detained for a reasonable amount of time. *See Van Leeuwen*, 397 U.S. at 249, 90 S.Ct. 1029 (upholding a twenty-nine hour seizure of a mailed package prior to the issuance of a search warrant based upon the specific facts of the case). A detention of a couple of hours (the difference between regular postal hours and mail room hours) to ensure that a fugitive is found is reasonable; Hinton's privacy rights were not violated.

## CONCLUSION

We affirm the district court's conviction, holding that the government presented sufficient evidence to convict Hinton of all three counts. In addition, the district court properly denied Hinton's motion to

suppress because Hinton did not have a reasonable privacy interest in the outside of a package placed in a parcel locker at a post office.

AFFIRMED.