UNITED STATE of America, Plaintiff,

v.

Jason Allen HIBBITT, Defendant.

No. Z00–141 CR(JWS).

United States District Court,
D. Alaska.

Dec. 28, 2000.

ORDER FROM CHAMBERS

SEDWICK, District Judge.

## I. MOTION PRESENTED

At docket 18, defendant Jason Hibbitt ("Hibbitt") moves to suppress evidence resulting from a seizure of his carry-on bag at the Ted Stevens International Airport in Anchorage, Alaska. Magistrate Judge John D. Roberts issued a Report and Recommendation at docket 27 recommending that Hibbitt's motion be granted. Plaintiff filed objections at docket 28, to which Hibbitt responded at docket 30. The magistrate judge filed a final recommendation at docket 31 reaffirming his original recommendation. This court reviews *de novo*.

## II. BACKGROUND

On July 20, 2000, Investigator Nathan Sheets of the Alaska State Troopers and Special Agent Angela Warner of the United States Drug Enforcement Agency were on duty in the Ted Stevens International Airport in Anchorage, Alaska.[1] Investigator Sheets saw two men—Hibbitt and England Edmonson—walking through the airport together.[2] Hibbitt was walking approximately ten (10) feet in front of Edmonson.[3] Hibbitt was looking around, perhaps innocently looking for a friend or perhaps looking for police.[4] As Hibbitt and Edmonson walked along, Edmonson would maintain his distance behind Hibbitt by slowing down when Hibbitt slowed down and stopping when Hibbitt stopped.[5] The manner by which Hibbitt and Edmonson were walking was suspicious to Investigator Sheets.[6] It appeared to him as if they were attempting to conceal the fact that they were traveling together.[7] Investigator Sheets had previously stopped drug traffickers who employed similar tactics to conceal the fact that they were traveling together.[8] Hibbitt and Edmonson proceeded towards an escalator leading down to the baggage claim level, at which point Hibbitt turned around and spoke to Edmonson who was still a few feet behind Hibbitt.[9] Hibbitt and Edmonson then entered a men's room on the baggage level although at that time Investigator Sheets did not know where they had gone. Hibbitt and Edmonson entered separate toilet stalls. Looking for Hibbitt and Edmonson, Investigator Sheets entered the men's room near the baggage claim area.[10] Investigator Sheets saw pants inside one of the stalls which he recognized as Hibbitt's.[11] He saw that someone else was occupying a separate stall, and surmised that that person must be the individual whom he had seen walking behind Hibbitt, later identified as Edmonson. Investigator Sheets heard the sound of suitcases or bags being opened in the toilet stalls occupied by Hibbitt and Edmonson.[12] Investigator Sheets did not hear any other sounds consistent with normal use of the toilet.[13] Based on his training and experi-

---

1. *See* Transcript of December 8, 2000 Evidentiary Hearing, filed December 14, 2000, docket 26 at p. 4, II. 19–20, p. 6, II. 18–22 (hereafter "TR at ___").

2. TR at p. 7, II. 2–12.

3. TR at p. 8, II. 10–15.

4. TR at p. 9, II. 4–14.

5. TR at p. 8, II. 2–9.

6. TR at p. 7, II. 17–24, p. 8, II. 19–23.

7. TR at p. 7, II. 11–12.

8. TR at p. 7, II. 21–24.

9. TR at p. 11, II. 3–25.

10. TR at p. 16, II. 4–9.

11. TR at p. 16, II. 6–12.

12. TR at p. 17, II. 2–4.

13. TR at p. 18, II. 2–10.

ence, Investigator Sheets knew that people carrying illegal controlled substances sometimes carried the substances on their persons until they had cleared security, and then transferred the substances to bags.[14] Investigator Sheets left the men's room after about a minute.[15] He re-contacted SA Warner and advised her of his suspicions.[16] Several minutes later,[17] Hibbitt and Edmonson left the men's room and continued walking towards the exit with Hibbitt again about 20 feet in front.[18] Hibbitt and Edmonson did not have any checked baggage.

Investigator Sheets then decided to talk with Hibbitt and Edmonson. Investigator Sheets contacted Hibbitt and SA Warner contacted Edmonson. The contact was taped, and a transcript of the contact has been filed at docket 24. Investigator Sheets identified himself, explained that Hibbitt was not under arrest, and asked to see Hibbitt's ticket.[19] Hibbitt's ticket revealed that he had traveled on a one way ticket purchased for cash. Hibbitt at first denied that he was traveling with Edmonson, but he admitted knowing Edmonson. The following exchange occurred:

> SA Warner (to Edmonson): Oh, going to Kenai?
>
> Edmonson: Yeah.
>
> SA Warner: Fishing or work?
>
> Edmonson: (indiscernible)
>
> Investigator Sheets: Are you going, are you traveling with him?
>
> Hibbitt: No.
>
> Investigator Sheets: Ok
>
> Hibbitt: I know him.

> SA Warner: (in the background) (indiscernible) (laughing)
>
> Investigator Sheets: Oh, you know him? Ok. Are you going to Kenai also or just in Anchorage?
>
> (SA Warner in the background [indiscernible])
>
> Hibbitt: Here in Anchorage.[20]

Edmonson, however, told SA Warner that he was traveling with Hibbitt.[21] Hibbitt advised Investigator Sheets that the purpose of his trip was to visit family. However, when asked where he going to be staying, Hibbitt said that he was "not exactly sure." The conversation between Edmonson, Hibbitt, Sheets, and Warner was somewhat strange in that when Investigator Sheets asked Hibbitt where he was going to be staying, Edmonson interrupted and answered for Hibbitt by advising "he doesn't know," as reflected by the transcript:

> Investigator Sheets: Seattle, ok. And the purpose of your trip up here is?
>
> Hibbitt: Going to visit family.
>
> Investigator Sheets: Visit family? Are you going to be staying with them?
>
> Hibbitt: Uh, hmm. [apparently an affirmative response].
>
> Investigator Sheets: Where at?
>
> Edmonson: He doesn't know.
>
> Hibbitt: I'm not exactly sure.[22]

Curiously, although Hibbitt did not know where he was going, he was the person who appeared to be leading the way through the airport. Investigator Sheets

---

**14.** TR at p. 17, II. 5–13.

**15.** TR at p. 18, II. 11–16.

**16.** TR at p. 18, II. 18–25.

**17.** TR at p. 19, II. 2–4.

**18.** TR at p. 19, II. 6–21, p. 20, II. 6–8.

**19.** TR at p. 20, II. 12–25, p. 21, II. 1–2.

**20.** *See* Transcript of Taped Contact, filed December 12, 2000, docket 24 at pp. 1–2.

**21.** *Id.* at p. 2. SA Warner asked Edmonson, "Were you guys traveling together or . . . ?" Edmonson answered, "Yeah." *Id.*

**22.** *Id.* at pp. 2–3.

asked Hibbitt for permission to search his carry-on bag. Investigator Sheets explained to Hibbitt that the circumstances seemed quite odd. In the his subsequent conversation, Hibbitt changed his earlier answer by stating that he was, in fact, with Edmonson:

> Investigator Sheets: Ok, Well, I do. Ok. You understand where I'm coming from. Like I say, if there's, if there's no drugs in the bag or anything like that, you[re] on your way in two minutes, but with your permission that's how long it'll take. Fair enough?
>
> Hibbitt: Well, yeah, I'm not really trying to (indiscernible). I really don't understand why (indiscernible)
>
> Investigator Sheets: Ok, well, Mr. Hibbitt, you're coming in on a cash one-way ticket, I'm asking you where you are staying and you're not exactly sure. Most people know where they're going, if they're coming . . .
>
> Hibbitt: (indiscernible)
>
> Investigator Sheets: well, hear me out, I'm telling you why I'm talking to you, ok. Most people come up here, they know exactly where they're going. They don't have sort of an idea, they know right where they're going. It's a long way to travel these days.
>
> Hibbitt: Yeah.
>
> Investigator Sheets: I've got an individual who tells me he's not traveling with another guy, but he just knows . . .
>
> Hibbitt: No, no, no. I'm with him. I'm with him . . .
>
> Investigator Sheets: Ok.
>
> Hibbitt: but I'm here to see him.[23]

Investigator Sheets then again asked for permission to search Hibbitt's bag, explaining that if Hibbitt denied permission, Investigator Sheets was going to have the bag tested with a device.

> Investigator Sheets: Ok, Mr. Hibbitt, I'm just asking your permission to do this, you know, answer my curiousity. Like I say, some things are kind of adding up here and I'm not saying anything against you, perhaps somebody's place [sic] something in your bag and that's why I'm asking your permission. Would that be acceptable?
>
> Hibbitt: (indiscernible) right now.
>
> Investigator Sheets: To search your bags?
>
> Hibbitt: Uh, huh. [apparently a negative response]. Like I said, I really feel (indiscernible) . . .
>
> Investigator Sheets: Ok, ok, well, I have a couple of options here, Mr. Hibbitt, ok. All right. I can ask your permission. We can do this as low key as possible or I can run a device around this bag and it'll take a sample off that bag and analysis [sic] it. It takes me about, maybe five minutes to get everything done and it'll tell me if anybody's been handling drugs and handling that bag. Do you use any type of drugs?
>
> Hibbitt: No, sir.[24]

Investigator Sheets subsequently testified that he decided to seize Hibbitt's bag approximately 10 minutes into the contact.

> QUESTION (By Hibbitt's Counsel): And I want to ask you now some questions about this—about when you decided to seize the bag or to—when you decided that you were not going to let Mr. Hibbitt leave with the bag prior to swabbing it and exposing the swab or the vacuum device or whatever it was to the ion scan machine.
>
> ANSWER (By Investigator Sheets): You're asking how —how far into the contact was it when —I'm not sure if I understand your correction (sic) if you— or question. If you could ask it one more time.

---

**23.** *Id.* at pp. 3–4.

**24.** *Id.* at p. 4.

Q: I'm asking you at what point did you decide that you were not going to let him leave with the bag, that you were going to first have it swabbed and exposed to the ion scan machine.

A: Pr—approximately 10, maybe—I would say 10 minutes into the conver— contact, if not a little bit sooner, I had made up in my mind that if he had chosen to leave, the bag was going to stay with me. About 10 minutes; a rough estimate, a third of the way into the contact.[25]

The device alluded to by Investigator Sheets was an Ion Track Itemiser ("Itemiser"). Such a device analyzes samples which are collected on a filter paper disk. The collection process is completed by wiping the paper disk over the surface to be tested or placing it in a special vacuum sampler which is used for collection. This process traps traces of particles remaining in the air or on various surfaces that have been left behind by narcotics. The paper disk is then taken to the Itemiser. The Itemiser is stored in a secured area away from the test subject. The paper disk is placed in the Itemiser's sampler bay for analysis. Trapped samples are evaporated and drawn into the detection system where they are analyzed by a technique known as Ion Trap Mobility Spectrometry. This technique operates by ionizing the target particles and then subsequently measuring the mobility of the ions in an electric field. The theory underlying the Itemiser is that the target ion of each controlled substance differs sufficiently so that each is uniquely identified. In theory, therefore, the Itemiser can identify the presence of controlled substances by the specific type of substance.

The Itemiser does not indicate what may or may not be inside a bag or luggage. Instead, all the instrument can detect is whether the outside of a bag or luggage may have come into contact with controlled substances. This may happen when a person who has touched controlled substances handles the bag or possibly if the bag or luggage rubs against other bags contaminated by residue of controlled substances. In theory, the alarm level is set high enough to eliminate false positives that might result if the bag merely rubs against other bags thus contaminated.

Investigator Sheets did not explain to Hibbitt that he had the option of denying permission to have an Itemiser test. Investigator Sheets told Hibbitt that he could run the Itemiser test with or without Hibbitt's permission.

Hibbitt: I mean you want to run something over my bag ...

Investigator Sheets: I sure can. It, I can run it on the outside with your permission ... that's what ... or I can do it without your permission ....[26]

Faced with the two options described by Investigator Sheets, Hibbitt eventually relented and agreed to let Investigator Sheets have an Itemiser test conducted on his carry-on bag. An operator was called. Hibbitt's carry-on bag was vacuumed. Hibbitt elected to stay while the test was run. The test came up with a positive reading for amphetamines.[27] Based on the positive Itemiser test, Investigator Sheets detained the bag and secured a search warrant. Hibbitt and Edmonson left the airport. A subsequent search of the bag uncovered cocaine.[28] No amphetamines were found in the bag.[29] The total time of

**25.** TR at p. 52, II. 3–18.

**26.** *See* Transcript of Taped Contact, filed December 12, 2000, docket 24 at pp. 4–5.

**27.** TR at p. 28, II. 9–10, p. 54, II. 14–16.

**28.** TR at p. 54, II. 10–18.

**29.** TR at p. 55, II. 22–24.

contact from the point when Investigator Sheets approached Hibbitt near the baggage claim area to the time when their conversation terminated was approximately thirty minutes.[30]

### B. *Procedural History*

On September 19, 2000, a federal grand jury indicted Hibbitt for knowingly and intentionally possessing with intent to distribute 500 or more grams of cocaine powder in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B). On November 27, 2000 at docket 18, Hibbitt moved to suppress the evidence seized from his carry-on bag. Hibbitt advanced two arguments in support of his motion. First, he contended that he was stopped solely because he was an African–American, and therefore that the contact violated the Fourteenth Amendment. Second, Hibbitt argued that the contact infringed upon his Fourth Amendment rights because Investigator Sheets lacked sufficient grounds to seize his carry-on bag or person. An evidentiary hearing was held on December 8, 2000. Investigator Sheets was the only witness called. At the conclusion of the evidentiary hearing, the Magistrate Judge advised the parties that his tentative opinion was that the motion to suppress should be granted.[31] At docket 27, the Magistrate Judge issued a Report and Recommendation on December 20, 2000 confirming his preliminary opinion that the motion

to suppress should be granted. The Magistrate Judge rejected Hibbitt's Fourteenth Amendment argument. However, the Magistrate Judge accepted Hibbitt's Fourth Amendment argument, finding that the contact and seizure of Hibbitt's bag was not supported by an articulable suspicion of criminal activity. Trial is scheduled for January 2, 2001.

### III. STANDARD OF REVIEW

The Fourth Amendment prohibits unreasonable searches and seizures.[32] A warrantless search is deemed unreasonable *per se* unless it falls within one of a number of narrowly construed exceptions.[33] The defendant has the burden of establishing that a search conducted pursuant to a warrant is illegal.[34] The government has the burden of justifying a warrantless search.[35] These burdens may be met by a preponderance of the evidence.[36] In evaluating probable cause for a warrant, the court assesses the facts presented to the magistrate at the time the warrant was secured.[37] The magistrate's decision to issue a search warrant is entitled to substantial deference and may be overturned only if that decision was clearly erroneous.[38]

### IV. DISCUSSION

### A. *Whether the initial stop was permissible*

---

30. TR at p. 31, ll. 5–7; p. 51, ll. 24–25 to p. 52, ll. 1–2.

31. TR at p. 77, ll. 23–25 to p. 78, ll. 1–6.

32. *See United States v. Place,* 462 U.S. 696, 700–01, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983).

33. *See Place, supra,* 462 U.S. at 701, 103 S.Ct. at 2641. *See also* Gregory S. Fisher, "Search and Seizure, Third–Party Consent: Rethinking Police Conduct and the Fourth Amendment," 66 Wash. L.Rev. 189, 190–91 (1991) (briefly summarizing relevant principles).

34. *See* 3 Charles Alan Wright, *Federal Practice and Procedure (Criminal),* § 675 at 782–83 (2d ed. 1982) (*"Wright"*).

35. *Id.*

36. *See Wright, supra,* § 675 at 784.

37. *Id.*

38. *See United States v. Stanert,* 762 F.2d 775, 778–79 (9th Cir.1985) (citing authorities and discussing principles).

Under *Terry v. Ohio*[39] and its progeny, law enforcement officers may briefly stop persons on less than probable cause if they have a reasonable suspicion based on specific articulable facts that a crime has been or is being committed.[40] As with determinations of probable cause, the concept of "reasonable suspicion" is elastic and resists precise definition or mechanical tests.[41] The court examines the totality of the circumstances to determine whether an investigatory stop was justified.[42] Such reasonable suspicion may be founded on objectively verifiable facts collectively known by the officers involved and reasonable inferences drawn from those facts based on the experience and training of officers.[43]

■ Law enforcement officers may freely approach citizens, identify themselves, and ask questions without implicating the Fourth Amendment.[44] Therefore, the mere fact that Investigator Sheets contacted Hibbitt does not offend the Fourth Amendment. However, as the Magistrate Judge correctly concluded, the initial investigative stop undeniably ripened into a seizure when Investigator Sheets decided to detain Hibbitt's luggage and subject it to an Itemiser test. Although fixing the precise point of the seizure is difficult, Investigator Sheets testified that he decided to seize Hibbitt's bag approximately 10 minutes into the 30 minute contact.

QUESTION (By Hibbitt's Counsel): And I want to ask you now some questions about this—about when you decided to seize the bag or to—when you decided that you were not going to let Mr. Hibbitt leave with the bag prior to swabbing it and exposing the swab or the vacuum device or whatever it was to the ion scan machine.

ANSWER (By Investigator Sheets): You're asking how —how far into the contact was it when —I'm not sure if I understand your correction (sic) if you— or question. If you could ask it one more time.

Q: I'm asking you at what point did you decide that you were not going to let him leave with the bag, that you were going to first have it swabbed and exposed to the ion scan machine.

A: Pr—approximately 10, maybe—I would say 10 minutes into the conver— contact, if not a little bit sooner, I had made up in my mind that if he had chosen to leave, the bag was going to stay with me. About 10 minutes; a rough estimate, a third of the way into the contact.[45]

In reference to the taped transcript of the contact, filed at docket 24, Investigator Sheets' decision to seize the bag appears to have been made no later than the time when Investigator Sheets advised Hibbitt that he had basically two options: consent to a search of the bag or the bag would be subjected to an Itemiser test without his consent.[46]

**39.** 392 U.S. 1, 20–21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

**40.** *See, e.g., Easyriders Freedom F.I.G.H.T. v. Hannigan,* 92 F.3d 1486, 1496–97 (9th Cir. 1996) (citing authorities and discussing principles).

**41.** *See Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).

**42.** *See United States v. Sutton,* 794 F.2d 1415, 1426 (9th Cir.1986).

**43.** *See United States v. Hall,* 974 F.2d 1201, 1204 (9th Cir.1992).

**44.** *See Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983).

**45.** TR at p. 52, II. 3–18.

**46.** *See* Transcript of Taped Contact, filed December 12, 2000, docket 24 at p. 4; *id.* at p. 5.

■ This court must evaluate whether the totality of the circumstances leading up to that decision afforded Investigator Sheets reasonable suspicion sufficient to justify his actions. The Magistrate Judge concluded that there were insufficient grounds to warrant a *Terry* stop. The Magistrate Judge carefully reviewed relevant authority, and there is no reason for this court to repeat the concise and accurate summation set forth in the Report and Recommendation.[47] This court does not disagree with the Magistrate Judge's instructive summary of case law. However, this court does disagree with some of the conclusions reached when the Magistrate Judge applied the case law to the situation at bar.

Briefly summarized, the record establishes that the following core facts supported the initial stop and investigative seizure of Hibbitt's bag:

1. Two men—Hibbitt and Edmonson— were walking through the airport together. Hibbitt was approximately ten (10) feet in front of Edmonson. Hibbitt was looking around, perhaps innocently looking for a friend or perhaps looking for police. As they walked through the airport, Edmonson would maintain his distance behind Hibbitt by slowing down when Hibbitt slowed down and stopping when Hibbitt stopped;

2. The manner by which Hibbitt and Edmonson were walking was suspicious to Investigator Sheets. It appeared to him as if they were attempting to conceal the fact that they were traveling together. Based on his training and experience, Investigator Sheets considered the manner by which Hibbitt and Edomonson were walking through the airport to be suspicious partly because, in other unrelated cases, he had stopped drug traffickers who employed similar tactics to conceal the fact that they were traveling together;

3. Hibbitt and Edmonson proceeded towards an escalator leading down to the baggage level, at which point Hibbitt turned around and spoke to Edmonson who was still a few feet behind Hibbitt;

4. Hibbitts and Edmonson then entered a men's room on the baggage level;

5. Hibbitts and Edmonson entered separate toilet stalls;

6. Investigator Sheets followed Hibbitts and Edmonson into the men's room and heard the sound of suitcases or bags being opened in the toilet stalls occupied by Hibbitt and Edmonson. Based on his training and experience, Investigator Sheets knew that drug couriers sometimes transfer controlled substances to luggage after they have cleared secured areas of the airport;

7. Investigator Sheets did not hear any other sounds consistent with normal use of the toilet;

8. Hibbitt and Edmonson left the men's room and continued walking towards the exit with Hibbitt again about 20 feet in front;

9. Hibbitt and Edmonson did not have any checked baggage;

10. When contacted, Hibbitt showed Investigator Sheets a one way ticket which had been purchased for cash. Hibbitt at first denied that he was traveling with Edmonson, but he admitted that he knew Edmondson;

11. Edmonson, however, told SA Warner that he was traveling with Hibbitt;

**47.** *See* Report and Recommendation, docket 27 at pp. 16–19. The cases cited and discussed by the Magistrate Judge include *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), *United States v. White*, 890 F.2d 1413 (8th Cir.1989), and *United States v. Millan*, 912 F.2d 1014 (8th Cir.1990).

12. Hibbitt advised Investigator Sheets that the purpose of his trip was to visit family;

13. However, when asked where he going to be staying, Hibbitt said that he was "not exactly sure."

14. The conversation between Edmonson, Hibbitt, Sheets, and Warner was somewhat strange in that when Investigator Sheets asked Hibbitt where he was going to be staying, Edmonson interrupted and answered for Hibbitt by advising "he doesn't know."

15. Although Hibbitt apparently did not know where he was going, he was the person who was leading the way (so to speak) in that he proceeded in front of Edmondson as they were walking through the airport.

16. Hibbitt subsequently amended his earlier answers to Investigator Sheets, and told him that he *was* with Edmonson and was "here to see him."

17. Hibbitt's responses were additionally inconsistent in that Hibbitt told Investigator Sheets that he was staying in Anchorage, whereas Edmonson had told SA Warner that he was going to Kenai.

18. Hibbitt's answers also seemed strange in that he was arriving in a strange city to visit relatives but had no real idea where his relatives lived, and apparently no clear idea of how to get to wherever his relatives resided.

19. Neither Hibbitt nor Edmondson had any checked baggage.

It is true, as the Magistrate Judge observed, that several of these circumstances are innocent in nature and entirely consistent with normal travel. However, as the United States Supreme Court explained in *United States v. Sokolow*,[48] a chain of otherwise innocent—seeming or innocuous circumstances may—in the aggregate—take on new meaning suggestive of suspicious activity or a chain of innocuous circumstances may be perceived in a different light by a trained and experienced law enforcement agent.[49] After reviewing the objections and the response thereto, and considering all of the facts and relevant legal principles, this court is persuaded that the collective weight of the circumstances underlying Investigator Sheets' decision to stop Hibbitt and briefly seize his bag were sufficient to support a *Terry* stop. This court believes that this case is closer to *United States v. Sokolow*[50] than to *Reid v. Georgia*[51] or the other authorities cited and discussed in the Report and Recommendation.[52] This court disagrees with the Magistrate Judge's conclusion concerning whether reasonable suspicion existed.

### B. *Whether the scope of the initial stop exceeded permissible limits*

▮ The lawfulness of the initial stop and investigative seizure of Hibbitt's bag, however, does not end the analysis.[53] A *Terry* stop does not authorize a far-ranging or intrusive examination of the person thus contacted and his or her effects, and a

---

**48.** 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

**49.** *See Sokolow, supra,* 490 U.S. at 7–11, 109 S.Ct. at 1585–87.

**50.** 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

**51.** 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).

**52.** *See* Report and Recommendation, docket 27 at pp. 16–19.

**53.** Plaintiff did not argue that there was probable cause coupled with exigent circumstances adequate to have supported a warrantless search of the bag. Accordingly, such an argument was not addressed by the Magistrate Judge and is not addressed by this court.

*Terry* stop does not permit law enforcement officers to detain a person for an unreasonable period of time. Instead, as the United States Supreme Court has carefully explained:

> [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.* It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.[54]

Professor Lafave instructs that officers may conduct *"non-search"* examinations of persons temporarily detained by looking at the person or his or her objects or shoes.[55] Here, plaintiff's implied premise is that an Itemiser test is no different than a dog sniff of luggage which, under *United States v. Place,*[56] may be completed without infringing upon an individual's Fourth Amendment rights, because the Court specifically held that a dog sniff of luggage was *not* a search for purposes of the Fourth Amendment.[57] However, neither party in the case at bar has expressly addressed whether an Itemiser test is or

should be considered a "search" for purposes of the Fourth Amendment. The inquiry is important because it affects analysis and application of the controlling legal principles.[58]

Perhaps one might read the Court's opinion in *Place* to support the implied premise relied upon by the United States in this case. There, the Court noted:

> A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.[59]

One might argue that an Itemiser test simply confirms the presence or absence of

---

54. *See Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (emphasis added) (citations omitted).

55. *See* 4 Wayne R. Lafave, *Search and Seizure,* § 9.2(f) at 54–55 (3d ed. 1996) ("*Lafave* ").

56. 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

57. *See Place,* 462 U.S. at 707, 103 S.Ct. at 2644–45.

58. In a recent case in this District, the United States conceded solely for the purposes of an appeal before the Ninth Circuit that an Itemiser vacuum test *was* a search for purposes of

the Fourth Amendment. *See United States v. Gavin,* A99–133 CR (JKS). In that case, Chief Judge Singleton granted a defendant's motion to suppress which the Ninth Circuit recently reversed in an unpublished Memorandum Disposition. The Ninth Circuit's reversal was not based on whether or not the Itemiser was or was not a search. Even if it were, an unpublished opinion may not be cited or relied upon by this court in another case. *See* Circuit Rule 36–3.

59. *See Place, supra,* 462 U.S. at 707, 103 S.Ct. at 2644.

controlled substances, and is therefore no more offensive than the dog sniff analyzed in *Place*. However, this conclusion is too facile to withstand scrutiny. The *Place* Court emphasized that "the canine sniff is sui generis." [60] The Court explained, "[w]e are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." [61] As discussed further below, there are significant differences between "dog sniffs" and "high tech searches."

The court has found no authority from any court addressing whether an Itemiser test is a search for purposes of the Fourth Amendment. It appears undeniable that this is an issue of first impression. [62] The court has found sources discussing the extent to which the use of gas chromatography and mass spectrometry might be considered a "search" under the Fourth Amendment. [63] That technology appears to be based on the same or related scientific principles as those involved with the Itemiser. These sources are discussed further below. However, precise analysis is not possible because the government

never presented any expert testimony concerning the Itemiser. Furthermore, no evidence was ever submitted in this respect; that is, the parties did not submit operating manuals, technical manuals, or any other form of information that would assist the court. For that matter, the government never even submitted calibration reports, maintenance reports, or any other form of information that would enable the court to determine if the instrument in question was operating normally. It is therefore not possible for the court to accurately analyze whether the Itemiser employs gas chromatography and mass spectometry. Be that as it may, the court will momentarily set aside these issues and briefly address the definition of "search" under the Fourth Amendment before returning to the question of whether us of an Itemiser constitutes a search.

■ There is no precise definition of what constitutes a "search" for purposes of the Fourth Amendment. [64] However, a "search" is generally recognized to mean "some exploratory investigation, or an invasion and quest, a looking for or seeking out." [65] Under the formulation expressed by Justice Harlan's concurrence in *Katz v. United States*, [66] a constitutionally defined

60. *See Place, supra,* 462 U.S. at 707, 103 S.Ct. at 2644.

61. *See Place, supra,* 462 U.S. at 707, 103 S.Ct. at 2644–45.

62. Discussing the "Sentor" device-a device which uses gas chromatography and mass spectrometry to detect controlled substances and one which appears to be functionally similar to the Itemiser used in this case—one commentator notes that "While the Sentor is frequently used without a warrant, no court has yet ruled on whether its warrantless use violates the Fourth Amendment's 'reasonable expectation of privacy' standard." *See* Richard S. Julie, "High–Tech Surveillance Tools and the Fourth Amendment: Reasonable Expectations of Privacy in the Technological Age," 37 Am.Crim. L.Rev. 127, 138 (2000) ("*Julie*").

63. *See Julie, supra. See also,* Peter Joseph Bober, "The 'Chemical Signature' of the Fourth Amendment: Gas Chromatography/Mass Spectrometry and the War on Drugs," 8 Seton Hall Const. L.J. 75 (1997) ("*Bober*"); 1 Wayne R. LaFave, *Search and Seizure,* § 2.2(g) at 64–69 (3d ed. Supp.2000) ("*LaFave*").

64. *See, e.g.,* 1 Wayne R. LaFave, *Search and Seizure,* § 2.1 at 379–95 (3d ed.1996) (generally discussing principles and citing authorities) ("*LaFave*").

65. *See Lafave, supra,* § 2.1(a) at 379 (*quoting* C.J.S., Searches and Seizures, § 1 (1952)).

66. 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

"search" only occurs when government activity encroaches upon a person, place, effect, or object in which a person has an actual (subjective) expectation of privacy which society is prepared to recognize as objectively reasonable.[67] Put differently, the mere fact that law enforcement officers look for something does not characterize their conduct as a "search." Instead, the activity and scope must affect something in which a person has a subjective expectation of privacy which society is prepared to recognize as objectively reasonable.

Courts and commentators have yet to-and may never fully-expostulate the intersection between law, technology, and the Fourth Amendment. However, some authority can be found to support an argument on the government's behalf in this case. For example, in *United States v. Kyllo*,[68] a Ninth Circuit panel held by a 2–1 vote that use of a thermal imaging scan to detect ambient heat emanating from a home was not a "search" for purposes of the Fourth Amendment because the device simply read "waste heat ... radiating from the outside surface of the home, much like a trained police dog would be used to indicate that an object was emitting the odor of illicit drugs."[69] The majority's analysis was significantly affected by its understanding that the waste heat thus detected was undifferentiated; that is, it did not tell law enforcement anything about particular activities that might be the source of the heat and revealed no "intimate details."[70] Judge Noonan authored a vigorous dissent. The United States Supreme Court granted a writ of certiorari and the case is currently docketed before the court for argument and briefing this Term.

Although *Kyllo* presents some discussion addressing thermal imaging technology within the context of the Fourth Amendment and therefore offers some predictive value concerning how the Ninth Circuit might begin to analyze Itemiser use, the case is ultimately unavailing because of differences in the technology. Thermal imaging as used in circumstances like those in *Kyllo* is used to examine waste heat radiating from a structure. Such thermal imaging involves no physical detention or physical manipulation of the structure "searched." Thermal imaging involves no chemical or microscopic analysis. Thermal imaging tells law enforcement personnel what heat levels are present, but it reveals no specific detail such as identity of the activity generating the heat.

Commentators have weighed into the debate between characterizing gas chromatography and mass spectrometry as a "search" or "non-search." Professor LaFave implies that use of gas chromatography and mass spectrometry technology should be considered a "search" for purposes of the Fourth Amendment, but concedes that a contrary conclusion might be appropriate if-but only if-the particular instrument employing the technology *"really* detects only illegal drugs and deals with all noncontraband organic substances in a fashion that ensures the operator of the equipment is unable to identify them".... [71] Another commentator concludes that use of a device called a Sentor which appears to be similar to the Itemizer, should be considered a "search" in part because "it is capable of detecting a great

67. *See Katz,* 389 U.S. at 361, 88 S.Ct. at 507 (Harlan, J., concurring).

68. 190 F.3d 1041 (9th Cir.1999).

69. *See Kyllo,* 190 F.3d at 1046.

70. *Id.* at 1047.

71. *See LaFave, supra,* § 2.2(g) at 68 (emphasis in original).

detail of information that is not evidence of crime...." [72] The record here does not address the extent of the Itemiser's detection capabilities. However, there *is* some suggestion that an Itemiser may detect lawfully prescribed substances. When Investigator Sheets advised Hibbitt that Hibbitt's carry-on bag had tested positive for amphetamines, the following exchange occurred:

> Investigator Sheets: Amphetamines. You use any type of, prescribed any amphetamines or methamphetamines by your doctor? Anything like that, Ritalin?
>
> Hibbitt: Nope. [73]

This exchange suggests—without categorically answering the question—that an Itemiser test may detect lawfully prescribed substances as well as unlawful substances.

Another commentator raises a different problem with devices employing gas chromatography and mass spectrometry principles:

> At first blush, one is apt to conclude that the Supreme Court would find the use of Sentor to be no different from the canine search in Place. *Such a conclusion would be misplaced because the two search methods diverge on an extremely important constitutional principle.* The Fourth Amendment's requirement of "probable cause" in regards to searches requires that there be individualized suspicion of a particular suspect who is thought to be engaging in criminal activity. A police officer must be able to point to specific and articulated facts which reasonably warrant the search. An officer needs to know that when a drug-sniffing dog "alerts" that a

particular individual is carrying narcotics, there is a strong likelihood that, that individual, and not some other person is the true trafficker.

> The detection and location of narcotics are two mutually exclusive tasks. A drug-sniffing canine is able to do both. That is, not only does the canine possess the ability to detect the presence of narcotics via its olfactory senses, the canine is further able to detect the location of the contraband. This is significant because not only does the canine's precision aid the officer in honing in on a specific location where narcotics have been hidden, it also substantially increases the likelihood that the individual or container that emitted the narcotic vapors was the person or thing that the dog had sniffed.

> Sentor is distinguishable. The device can only tell you that drugs are in the air. A dog, however, can not only tell you drugs are there, but exactly where they are. The problem is that air is fluid and moves whether individuals pass through it or not. The theories behind this idea are the principles of Brownian motion and diffusion. [74]

The commentator then discusses Brownian motion and diffusion and concludes:

> Sentor is unable to discriminate whose air it inhales. As a result, Sentor may erroneously alert an officer that an individual is carrying contraband, thus giving probable cause to conduct a full search of that innocent individual. [75]

This concern for the lack of certainty as to the source is reflected in other comments regarding the Sentor. It has been suggested that use of the device is a search because "the collection process (suctioning

---

**72.** *See Julie, supra,* 37 Am.Crim. L.Rev. at 138.

**73.** *See* Transcript of Taped Contact, filed December 12, 2000, docket 24 at p. 13.

**74.** *See Bober, supra,* 8 Seton Hall Const. L.J. at 108–09 (emphasis added).

**75.** *See Bober, supra,* 8 Seton Hall Const. L.J. at 109.

air from around the suspect's body) does not lend itself to easily distinguishing the source of the collected chemical compounds." [76]

Although the court realizes that, in terms of its specific use, the Sentor may be different from the Itemiser, the basic scientific principles underlying both instruments seem similar and—perhaps more significantly—the problems associated with use of the Itemiser seem comparable to those discussed by the commentators in relation to the Sentor. The Itemiser detects whether an item has come into contact with a controlled substance. It does not tell law enforcement whether a controlled substance is inside the item. The contact which "alerts" the Itemiser (to use a word associated with dog searches) could result from a baggage handler touching the luggage or from the luggage rubbing against other luggage or some other person, or so far as this record discloses from some nearby source other than the luggage being tested.

Applying all of these principles to the facts of this case, the court concludes that the Itemiser test conducted on Hibbitt's luggage is closer to a search than a "non-search" for purposes of the Fourth Amendment. The court wishes to emphasize that it is *not* holding that using an Itemiser is, in fact, a search based on the present record. However, characterizing an Itemiser as being closer to a "search" than a "non-search" is important because-as will be discussed in detail further below-it affects analysis of the aggregate circumstances surrounding the seizure of Hibbitt's bag.

The Itemiser test is clearly distinguishable from dog sniffs for multiple reasons. First, the test used here required physical seizure of luggage, physical manipulation of the luggage and considerable delay. This is differs markedly from a dog sniff which (assuming the dog is present) can be done without delay and without even touching the object to be searched. Second, unlike the dog sniff at issue in *Place*, the use of an Itemiser may provide information about someone's personal effects *other than* that the effects include illegal controlled substances. To expand this point a bit, it may be noted that the Itemiser test is not limited in scope or degree. The scientific principles underlying the test could be used to detect virtually any substance or material. A dog sniff merely confirms the presence or absence of controlled substances and cannot collect any information other than that. Third, an instrument like the Itemiser apparently can be re-set, reconfigured, or reprogrammed to detect a wide array of information and can be set to alarm at different levels of whatever it is for which it has been set to search. Thus, unfettered use by law enforcement is more problematic than using a dog which is simply trained to detect the presence of controlled substances in a precisely defined object.

Fourth, and most importantly, use of the Itemiser can not truly confirm or dispel an officer's suspicion that a particular person is carrying an illegal controlled substance. This is because the test results do not resolve whether or not a piece of luggage contains controlled substances.[77] The in-

---

**76.** *See* Julie, *supra,* 37 Am.Crim. L.Rev. at 138.

**77.** The trace amounts of controlled substances which may be registered by testing the exterior of a piece of luggage only reveal that someone-not necessarily the person possessing the bag at the time it is being searched—who handled the bag also handled controlled substances or that the bag itself may have rubbed against other items containing controlled substances. Certainly, use of the Itemiser does not establish that the detected substance is in the luggage. Indeed, here one controlled substance was detected, but another was eventually found.

vestigative methods employed by law enforcement officers pursuant to a *Terry* stop must be the least intrusive available and must be such as to afford sufficient grounds to confirm *or* dispel their suspicions. Whatever validity the Itemiser test may or may not have, its use clearly is limited to collecting additional evidence and not to confirm or dispel any suspicions about what is actually being carried.

Technology is quickly outstripping—has outstripped—Fourth Amendment jurisprudence. Science has developed ever increasing ways by which the government might secure, develop, and maintain discrete information about individuals.[78] Increasingly invasive technology runs the risk of subjecting countless citizens to unwarranted invasions of their person or property. For example, numerous reports in the past ten years have documented the fact that most currency circulated in the United States is contaminated with cocaine residue.[79] Sensitive instruments such as the Itemiser pose the risk of eroding Fourth Amendment rights if their use is not coupled with practical common sense and careful study of the other circumstances surrounding an incident. One commentator writes:

> The legal implications of such a machine that searches for drugs on a molecular level are enormous. Imagine shaking hands with a cocaine user that had used the drug only hours before. Unbek-

nowst to you, there is now likely to be a trace residue of cocaine on your hands. You later hug a loved one and transfer a molecular particle of cocaine to them. After showering and washing your hands thoroughly, a trace amount of cocaine is likely to remain on your body. Although you are unaware of your "molecular possession," you could possibly be the victim of a humiliating search because the police, having reasonable suspicion to employ the Sentor device have detected a particle of cocaine as small as one part per one hundred trillion.[80]

The best way to balance society's rights with the rights of individuals and the legitimate needs of law enforcement is to lean towards characterizing tests such as the Itemiser as a "search" for purposes of the Fourth Amendment, and analyzing such tests accordingly. This would require the police to collect more information and carefully evaluate that information before they resort to using the Itemiser as an investigative aid.

 Having concluded that the Itemiser test is closer to a "search" than a "non-search" for purposes of the Fourth Amendment, the next question is whether seizure of Hibbitt's bag exceeded the permissible scope of a *Terry* stop. The court believes that under the precise circumstances in this case, it did. This finding is

---

78. *See, e.g.,* David A. Harris, "Superman's X-Ray Vision and the Fourth Amendment: The New Gun Detection Technology," 69 Temp. L.Rev. 1 (1996) (discussing new surveillance technology that enables law enforcement officers to detect concealed metal and concealed guns from a distance); George M. Dery III, "The Loss of Privacy is Just a Heartbeat Away: An Exploration of Government Heartbeat Detection Technology and its Impact on Fourth Amendment Protections," 7 Wm. & Mary Bill Rts. J. 401 (1999) (discussing new technology which enables government to detect the beating of a person's heart).

79. *See, e.g.,* Laura Bell, "Discoveries: Science Update," Dallas Morning News, April 6, 1998, 1998 WL 2526223; James Bovard, "Snooping Eyes on Savings?," The Washington Times, January 28, 1999, 1999 WL 3076799; *see also United States v. U.S. Currency,* 39 F.3d 1039, 1041–44(9th Cir.1994) (probable cause for currency seizure found lacking where evidence presented established that over 75% of U.S. currency in the area was contaminated with some degree of cocaine residue).

80. *See* Bober, *supra,* 8 Seton Hall Const. L.J. at 77.

based on the aggregate weight of multiple circumstances, five being most significant. First, Hibbitt was never advised whether he could grant or withhold consent to have an Itemiser test conducted. In fact, he was expressly told that an Itemiser test could be conducted without his consent. Second, the Itemiser test was not readily available. Neither Investigator Sheets nor SA Warner had the device ready to go on the scene. Instead, they had to call an operator from an unspecified location to come and collect a sample and run a test. Unlike a brief dog sniff which could be effected on the spot without delay, the Itemiser test could not be run without waiting a number of minutes for the operator to arrive on the scene, collect a sample, return to the location where the Itemiser was stored, and run the test. Third, the Itemiser is an intrusive device. Although it may not be as physically invasive as squeezing a bag for purposes of a tactile search, it requires handling and some physical interaction with the item to be tested. Whether a paper disk is rubbed over the bag or whether a vacuum device is used, the operator must physically handle and manipulate the subject bag when collecting a sample. Although this level of physical manipulation may fall short of that proscribed in *Bond v. United States*,[81] it necessarily invites increased concern. Fourth, the seizure was prolonged specifically for the purpose of conducting an Itemiser test which, in turn, was intended to support a search warrant application. Thus, the temporary stop evolved into a sort of "fishing expedition" for the purpose of collecting additional evidence and *not* for the purpose of promptly confirming or dispelling suspicions. Fifth, the scope of an Itemiser's search is broad. The device

apparently detects lawful and unlawful substances and does not necessarily detect substances actually inside the thing tested. It may therefore detect lawfully prescribed substances which rubbed against one's bag from contact with another bag or a baggage handler. This court wishes to stress that it is *not* holding that law enforcement may not use an Itemiser as an investigative tool without probable cause and a search warrant. However, based on the specific circumstances of this, the United States has not established that the seizure of Hibbitt's bag for purposes of conducting an Itemiser test was sufficiently limited in scope and duration to satisfy the conditions of a lawful investigative seizure. To return again to the United States Supreme Court's instruction:

> [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.* It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.[82]

Here, for all of the reasons previously discussed, the investigative seizure of Hibbitt's bag exceeded the permissible scope of investigative seizures.

### C. Whether the Seizure of the Bag may be Upheld as a Consent Search

██ The Magistrate Judge noted that "It was not explained to Hibbitt that he had a choice whether to consent to an itemizer test on his bag."[83] The Magis-

---

**81.** 529 U.S. 334, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000).

**82.** *See Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (emphasis added) (citations omitted).

**83.** *See* Report and Recommendation, filed De-

trate Judge concluded that "[t]he use of the Itemiser cannot be predicated on the defendant's voluntary consent."[84] The court agrees that no valid consent was given, but explains its conclusion somewhat differently than did the Magistrate Judge.

During his contact with Hibbitt, Investigator Sheets told Hibbitt that he could run the Itemiser test with or without his permission.

> Hibbitt: I mean you want to run something over my bag . . .
>
> Investigator Sheets: I sure can. It, I can run it on the outside with your permission . . . that's what . . . or I can do it without your permission . . . .[85]

In effect, Hibbitt was told in advance that, whether he gave his consent or not, his bag was going to be subjected to a test of some sort. The test itself was never precisely described to Hibbitt. The voluntariness of consent is assessed by the totality of the circumstances.[86] Where law enforcement officers claim authority to seize or search regardless of whether or not consent is given, courts rarely find that valid consent exists.[87] Here, as noted, Investigator Sheets essentially told Hibbitt that he could run the Itemiser test whether or not Hibbitt consented. Accordingly, the fact that Hibbitt subsequently relented and allowed an Itemiser test to be conducted does not establish lawful consent for the purposes of the Fourth Amendment.[88]

One final note is necessary for clarity's sake. As previously discussed, the Magistrate Judge appeared to find fault with the fact that Investigator Sheets never told Hibbitt that he could withhold consent if he wanted. The Magistrate Judge observed that, "[i]t was not explained to Hibbitt that he had a choice whether to consent to an itemizer test on his bag."[89] This court does not understand the Magistrate Judge's order as holding that law enforcement officers must advise persons that they have the right to withhold consent, a rule which would not seem consistent with existing precedent.[90] Instead, the Magistrate Judge's concern seems moored to the fact that, in some circumstances, an advisement or warning is appropriate to "counteract other coercive ele-

---

cember 20, 2000, docket 27 at p. 20.

**84.** *See* Report and Recommendation, filed December 20, 2000, docket 27 at p. 20.

**85.** *See* Transcript of Taped Contact, filed December 12, 2000, docket 24 at pp. 4–5.

**86.** *See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *see also* 3 Wayne R. LaFave, *Search and Seizure,* § 8.2 at 635 (3d ed. 1996) (*"LaFave"*).

**87.** *See Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *see also, LaFave, supra,* § 8.2(a) at 637–43 (for discussion of principles with citation to authority).

**88.** Disposing of the consent issue on this basis obviates the need for any further analysis. However, it merits note that consent is based on the concept of a knowing and intelligent waiver. It is at least subject to some doubt whether Hibbitt could have given a knowing and intelligent waiver when the Itemiser test was never really explained to Hibbitt in any meaningful manner. This court is *not* suggesting that law enforcement officers must give persons detailed briefings on the Itemiser test before seeking consent. However, something more than the description given to Hibbitt in this case would seem to be more appropriate. The court need not and does not reach this issue. But it might be appropriate for law enforcement officers relying on the Itemiser to develop a more meaningful description of the device and the testing procedures to use when soliciting consent to conduct a test.

**89.** *See* Report and Recommendation, filed December 20, 2000, docket 27 at p. 20.

**90.** *See LaFave, supra,* § 8.2(i) at 685–90.

ments." [91] Here, as noted, the coercive elements were present in Investigator Sheets advisement to Hibbitt that he could run an Itemiser test regardless of whether or not Hibbitt granted or withheld consent. In these unique circumstances, it would have been appropriate for Investigator Sheets or SA Warner to specifically advise Hibbitt that he could withhold consent if he wanted. Thus construed, the Magistrate Judge's findings and conclusions with respect to whether or not Hibbitt consented to have an Itemiser test conducted on his bag should not be disturbed.

### D. Whether the "Good Faith" Exception may Validate the Search Warrant

The United States expressly disavowed reliance on the good faith exception rule established under *United States v. Leon.*[92] At the conclusion of the evidentiary hearing, the following colloquy occurred between the Magistrate Judge and the Assistant United States Attorney arguing the case on the government's behalf:

> THE COURT: There's some mention in the defendant's initial brief about *Leon.* You're relying upon articulable suspicion and consent. If you were to lose on those, would—are you relying on *Leon* to uphold the warrant? I don't see it briefed—
>
> MR. BROWN: Your Honor, I didn't—
>
> THE COURT:—or particularly argued.
>
> MR. BROWN: —address it in the brief, and I have to tell you, I didn't find *Leon.* I was on the computer, and I couldn't loc—
>
> THE COURT: Well, it's a major case. It's—
>
> MR. BROWN: I know. So, I mean, rather than try to hip-shoot something, I

left it out. I think the facts in this case clearly show that they did have reasonable articulable suspicions all the way up through the right to detain, even though there was consent [sic], and that the warrant, which was properly granted afterwards by the State Magistrate, would clear anything.

> THE COURT: Well, I'll consider there's not a good-faith argument made to support the warrant.
>
> MR. BROWN: No.[93]

This court is therefore not confronted with an argument that the search warrant should be upheld based on application of *Leon's* good faith exception rule,[94] and accordingly does not reach that issue.

## V. CONCLUSION

For the foregoing reasons, this court accepts the ultimate conclusion set forth in the Magistrate Judge's Report and Recommendation filed at docket 27, but does so through a somewhat different analysis. The initial stop was lawful. Investigator Sheets had ample reasonable suspicion supported by specific, articulable facts that a crime was being or had been committed. However, the initial stop exceeded permissible bounds when Hibbitt was detained for so long and his luggage was subjected to an Itemiser examination without a search warrant. Although, there are questions on the current record concerning the Itemiser's operation and use, the burden was on the government to establish grounds supporting an exception to the Fourth Amendment's warrant clause. The government has failed to do so. Hibbitt's motion at docket 18 is **GRANTED**. This

---

**91.** *See LaFave, supra,* § 8.2(i) at 688.

**92.** 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

**93.** TR at p. 72, II. 13–25 to p. 73, II. 1–8.

**94.** *See, e.g., United States v. White,* 890 F.2d 1413, 1419 (8th Cir.1989).

result renders it unnecessary to address the other arguments advanced by Hibbitt.